OWEN v. PRESIDIO MINING CO. et al.

(Circuit Court of Appeals, Fifth Circuit. March 13, 1893.)

No. 58.

1. MEXICAN LAND GRANTS—PROOF OF EXECUTION.
    A grant which would include over 2,000 square miles of land was alleged to have been made January 25, 1832, by the alcalde of Presidio del Norte, state of Chihuahua. The sole documentary proof thereof was a certified copy of an alleged testimonio record in Bexar county, Tex., in 1851, showing the original grant, a subsequent act of transfer, and various certificates. These papers were of different dates, not in chronological order, but all apparently constituting one document. For the purpose of procuring the record to be made, two persons had made affidavit of the genuineness of the signatures, but the terms of one affidavit were unsatisfactory, and the authors of both were shown to have been dependents of the persons then claiming under the grant. It further appeared that in the interest of those claimants, a forged paper, purporting to be a decree confirming the grant by the congress of Chihuahua, was surreptitiously introduced into the public archives of Juarez, Mexico. The parol testimony as to whether such a grant had ever been heard of prior to 1848 was conflicting, and gave rise to no inferences favorable to the claimants. *Held*, that the evidence was insufficient to establish the execution of the grant.

2. SAME—POWERS OF ALCALDE.
    The fact of the making of a grant of land by an official of the state of Chihuahua raises no presumption that he had power to do so, if the grant was executed after the adoption of the colonization law of May 25, 1825; and under that law the alcalde of a village had no power, in 1832, to make grants of the public lands.

3. SAME—DECREE OF CONFIRMATION—EVIDENCE TO ESTABLISH.
    A claimant of lands under an alleged grant by a village alcalde who had no authority to make it sought to support the same by showing a decree

of confirmation by the congress of Chihuahua in 1834, and for this purpose introduced a paper purporting to be such a decree, but which was entirely in print, without written signature, seals, rubrics, or other marks of attestation. This paper was found in 1890, in the archives of Santa Barbara, a mining town, 150 miles from the capital of Chihuahua, under circumstances not calculated to strengthen any presumptions of genuineness. Further, it bore an irregular or fraudulent number, and there was no entry on the proper registry that such a decree had ever been received and filed. The weight of evidence was that no such decree had ever been heard of in connection with the alleged grant prior to 1887. It appeared further that a forged decree of confirmation had at some time been introduced into the archives of Juarez, Mexico. *Held*, that the genuineness of the document was not established.

'Appeal from the Circuit Court of the United States for the Western District of Texas.

This is a suit in equity, brought by the complainant, Ernest Dale Owen, as trustee, a citizen of the state of Illinois, against the Presidio Mining Company, a corporation of the state of California, and against William Noyes, the superintendent of said mining company, a citizen of Texas, and John L. Bullis, a citizen of the territory of Arizona, to recover section 8 in block 8 of the survey of the Houston & Texas Central Railway Company in Presidio county, Tex., to quiet the title thereof, and to recover the value of silver ore extracted by the Presidio Mining Company from the mines situated thereon, and praying for a receiver and an injunction.

The original bill of the complaint, said to have been filed on the 29th day of January, 1890, does not appear in the transcript. By the amended supplemental bill of the 13th of July, 1891, complainant claims title to the land in controversy by means of certain conveyances from the heirs of Lieut. Col. Jose Ygnacio Ronquillo under a grant of land alleged to have been made to him by the alcalde (conciliador) of Presidio del Norte, state of Chihuahua, Mexico, on the 25th day of January, 1832, for 15 leagues square of land, or 2,345½ square miles, situated on the east bank of the Rio Grande river, and now in the counties of Jeff Davis, Brewster, and Presidio, in the state of Texas.

The bill alleges that in November of the year 1832, Ronquillo petitioned the governor of the state of Chihuahua to be excused from the performance of the condition of the grant by reason of being ordered away from the frontier on an excursion against the Indians, and that the same was allowed on the 12th of November, 1832; that on the 27th of November, 1832, a certificate was made by the alcalde of Presidio del Norte in pursuance of an order made by the governor excusing him from the performance of the conditions of the grant; that the grant was confirmed by the congress of Chihuahua on the 24th day of September, 1834; that in 1849 the testimonio of the grant was offered for record in the office of the county clerk in Bexar county, Tex., that being the proper place and the proper office for such registration at that time; that the testimonio was accompanied by the affidavit of one witness, Cesario Ureta, dated the 17th day of August, 1849, and afterwards an additional affidavit for proof by one Edward Hall was filed, dated July 10, 1851; and that on July 11, 1851, the testimonio was recorded in Bexar county; that in 1850 the grant was surveyed by Richard A. Howard, the official deputy district surveyor for the district of Bexar; that his survey was certified as correct by the official surveyor of Bexar district, and this survey was recorded in the regular surveyor's office of that district, at San Antonio, February 27, 1851; that in 1854, when El Paso county, Tex., was organized, the grant was recorded in the proper records of that county; that the field notes of the Howard survey were also recorded in El Paso county in 1854, both in the record of deeds and the surveyor's records, and again recorded in the surveyor's office of Presidio county in October, 1873; that in 1855 the outline

of this grant was marked on the county map filed in the general land office of Texas, and there designated as the "Ben Leaton Claim."

The defendants, in their answer, deny the claim of title set up by the complainant in his bill and amended bill, and say it is not true in fact that any grant or any portion thereof, was ever made by the alcalde of Presidio del Norte, or by the state of Chihuahua, or by any legal authority of the said state, to Jose Ygnacio Ronquillo on the 25th day of January, 1832, or by any other title; and they deny that the said alleged grant of the 24th of September, 1834, was ever ratified or confirmed by the congress of the state of Chihuahua, or by any other legal authority. Defendants also plead that they are innocent purchasers in good faith, and the statutes of limitations of three and five years.

A stipulation in the record admits that the complainant has acquired, by mesne conveyances, whatever title Lieut. Col. Ronquillo had, unless the same has been lost by something occurring since the grant; but it is not admitted that Ronquillo had any title.

The only documentary evidence offered by the complainant in support of said grant is the copy of the alleged testimonio from the records of Bexar county, state of Texas, and the duplicate printed copy of the alleged decree of confirmation certified from the archives of Santa Barbara, a small mining town in the state of Chihuahua, Mexico. The genuineness of the alleged testimonio recorded in Bexar county, Tex., and of the purported printed decree from the archives of Santa Barbara, is denied in the defendants' answer, and both are impeached as forgeries in the affidavit on file in the cause.

On a hearing in the circuit court upon all the evidence the court reached the conclusion that the alcalde who executed the grant had no power to execute the same, and that the same was void; and, further, that the same was never confirmed by the congress of Chihuahua, and thereupon entered a decree dismissing complainant's bill.

Seth F. Crews, John Ireland, A. G. Foster, Wm. H. Burges, and Earnest Dale Owen, for appellant.

Thos. J. Beall, for appellees.

Before PARDEE and McCORMICK, Circuit Judges, and LOCKE, District Judge.

PARDEE, Circuit Judge (after stating the facts). The first question presented in the consideration of this case is, did Cesario Herrera, alcalde of Presidio del Norte, make and execute the alleged grant to Jose Ygnacio Ronquillo on the 25th day of January, 1832? The burden is on the complainant to establish such a grant. He offers for the purpose no original documentary evidence of any kind or description, no record from the alcalde's office, no record, memorandum of, or reference to, any such grant, from any of the public archives or other places where such evidence, if the grant was actually made, should be found, either in the state of Chihuahua or in the republic of Mexico, save and except the printed copy of the alleged decree of confirmation of the congress of Chihuahua, found in Santa Barbara, hereafter referred to. The following admission appears from a stipulation in the record:

"That complainant has made diligent search among the archives and records in the cities of Austin, San Antonio, and El Paso, in the state of Texas, and in Presidio del Norte (or Ojinaga), Juarez, and in the city of Mexico, in the republic of Mexico, for the original expediente, protocol, and testimonio of the grant which complainant claims to have been made to Jose Ygnacio Ronquillo on the 25th day of January, 1832, by Cesario Herrera, alcalde of Presidio del Norte, and that these are all the places where the same might have been reasonably expected to be found, and the said town of Presidio del Norte (or Ojinaga) being the place where, by law the original expediente

and protocol of said title was originally required to be filed and archived, and that the same are not among the records and archives; and that complainant has also inquired of and made diligent search with all persons where the same might reasonably be found, and has been unable to find the same; and that the same, if they ever existed, are either lost, destroyed, or cannot be found. It is not admitted, but denied, by defendants that the same ever existed."

The parol evidence offered giving the recollection of witnesses (many of them interested witnesses) as to whether any such grant was known or heard of prior to 1848 is so fully met by contradictory evidence of the same nature, offered on the other side, that, after reading and considering the same, no impression favorable to the complainant is derived from it. The sole documentary evidence offered to establish that such a grant was made is the copy of the record produced from the office of the clerk of the county court of Bexar county, state of Texas, which shows that on the 16th day of August, 1849, a paper purporting to be a testimonio of the title for lands granted in favor of Don Jose Ygnacio Ronquillo on the 25th day of January, 1832; also a public act passed on the 27th day of November, 1832, bargaining the said grant of lands by Jose Ygnacio Ronquillo to one Hypolito Acosta; also a certificate on the 10th day of May, 1833, signed by Hypolito Acosta and Juana Pedrasa, that the said Juana Pedrasa is interested in the lands in question; and also a certificate by said Cesario Herrera, alcalde, on the 27th day of November, 1832, to the effect that Don Jose Ygnacio Ronquillo has complied with all the conditions of law on the subject, and therefore has the right to sell at his will (all, testimonio, transfer, and certificate, though of different dates, apparently forming one document),—was offered for record; and on the same day one Cesario Ureta made affidavit that he was well acquainted with the signatures of Cesario Herrera, Rafael Hernandez, Hypolito Acosta, and Juana Pedrasa to the annexed instrument of writing, and knows the same to be genuine and good; and, further, that the said persons above named resided out of the limits of the state of Texas; and afterwards, on July 10, 1851, one Edward Hall made affidavit that he had transacted business with Cesario Herrera, Rafael Hernandez, and Hypolito Acosta, and that he had often seen them sign their names, and that the signatures of Cesario Herrera, Rafael Hernandez, and Hypolito Acosta, as they appear at the foot of the annexed instrument of writing, he knew to be genuine and good; and, further, that the said Herrera, Hernandez, and Acosta were either dead, or out of the limits of the state of Texas; and thereupon the said document was recorded.

Considering the make-up of the document, and that it purports to be a record of several transactions, not in chronological order, and each purporting to be attested by a different set of witnesses, it is very doubtful whether the affidavits of Ureta and Hall furnished sufficient proof to warrant the county clerk of Bexar county to record the same. The presumption is very strong that the alleged testimonio is, at best, only a copy of a testimonio. As to the propriety of the record as made, see Pasture Co. v. Preston, 65 Tex.

454; and as to effect if recorded without sufficient proof, see Holliday v. Cromwell, 26 Tex. 189; Lambert v. Weir, 27 Tex. 359.

The original of this document, although presumably in the custody of the parties claiming title under it, is neither produced nor accounted for. As made and proved, this record unquestionably shows that the complicated document claimed by complainant to be a testimonio of his title was in existence on the 16th day of August, 1849,—17 years after the date of the alleged grant; but as to the persons who made and executed it we are left to the evidence of Hall and Ureta, and as to when it was made we are remitted to the document itself. The affidavit of Ureta is to the effect that he was well acquainted with the signatures, among others, of Cesario Herrera and Rafael Hernandez, two of the persons whose names purported to be signed to three of the separate acts contained in the document; and he swore that he knew the same to be genuine and good, without giving in any manner his means for so knowing, and without specifying which particular signatures of Herrera and Hernandez were genuine and good. If any credit is to be given to his affidavit, it is to be taken that he meant that all of the signatures of Cesario Herrera and Rafael Hernandez were genuine and good. The affidavit of Ureta, however, does not appear to have been sufficient in terms to satisfy the clerk of the county court of Bexar county of the genuineness of the document.

The affidavit of Hall is more full as to his knowledge, and he says that he "has transacted business with Cesario Herrera, Rafael Hernandez, and Hypolito Acosta; that he has often seen them sign their names; and that the signatures of Cesario Herrera, Rafael Hernandez, and Hypolito Acosta, as they appear at the foot of the annexed instrument in writing, he knows to be genuine and good." The names of Cesario Herrera, Hypolito Acosta, and Rafael Hernandez appear, among others, at the end of the alleged grant, and at the end of the alleged transfer or act of sale from Jose Ygnacio Ronquillo to Hypolito Acosta. Which signatures of said Herrera, Hernandez, and Acosta affiant Hall knew to be genuine and good does not appear.

In the case of Luco v. U. S., 23 How. 515, it was held that no Mexican grant in the state of California should be considered genuine unless documentary evidence thereof should be found in the archives; and in Peralta v. U. S., 3 Wall. 434, it is held that record evidence of a grant must be shown and be produced or accounted for, and mere parol evidence will not suffice to establish it. The document recorded in Bexar county came from the possession of, and was undoubtedly recorded in the interest of, Ben Leaton and Juana Pedrasa, with whom said Leaton is shown to have been living at the time the same was presented for record. Both Ureta and Hall were employes and dependents of Leaton; and Hall, after Leaton's death, married Juana Pedrasa. It also appears that the only trace of the grant in the general land office of the state of Texas is an old map found there, marked "Ben Leaton's Claim." The evidence also shows that Ben Leaton and Cesario Herrera were acquainted, if

not intimate; that Leaton borrowed $500 to buy land, and that Herrera was arrested by the Mexican authorities for issuing false titles to land; and there is some evidence which, if believed, shows that Herrera was contemplating the forging of this very document. It is admitted that in the Leaton interest,—that is, the Juana Pedrasa interest,—under which, so far as it is good, complainant claims (and it would seem to cover the entire title, if the document under consideration is taken as genuine), a forged and false decree, purporting to be a confirmation of the grant and transfer by the congress of Chihuahua, was surreptitiously introduced and placed in the public archives of Juarez, in the state of Mexico, which forged and false decree of confirmation was the basis of the title claimed by complainant in his original bill in this case.

The supreme court of the United States, in passing on a grant alleged to have been made by the Mexican governor of California, said:

"The signatures of M. G. Vallejo to the permit of occupation, and of Micheltorena and F. C. Arce, the governor and acting secretary, are genuine, if three witnesses are to be believed,—Castenada, W. D. M. Howard, and Salvador Vallejo, one of the original grantees. * * * We have said that the signatures of the officers to the documentary evidence of the title are genuine if we can believe the witnesses Castenada, Howard, and Vallejo; but, as all of these officials were living after the United States had taken possession of the country during the war, and even after the cession by Mexico, and, with the exception of the governor, resided in California, these signatures may be genuine, and still the title invalid. It was practicable to have made the grant in form genuine, but antedated." U. S. v. Teschmaker, 22 How. 402-404. See, also, Fuentes v. U. S., Id. 454.

Enough has been said to show that we have been unable to find affirmatively from the evidence in this case that on the 25th day of January, 1832, Cesario Herrera, alcalde of Presidio del Norte, executed the alleged grant to Jose Ygnacio Ronquillo. As to the execution of such a grant, the complainant has failed to establish his case, unless he has established that the congress of Chihuahua, in 1834, by decree for the purpose, ratified and confirmed the said grant, which matter will be considered in its order.

If we assume for the purposes of the case that Cesario Herrera, alcalde of Presidio del Norte, on the 25th day of January, 1832, actually made and executed to Jose Ygnacio Ronquillo the grant in question, the next inquiry is whether said Cesario Herrera, alcalde, had the power to make such a grant. An alcalde is "a justice of the peace or judge who administers justice in a town, the presiding officer of a town council." 1 Sayles' Early Laws of Texas, p. 13. At first impression a person at this day is struck with astonishment at a claim of power on the part of an alcalde of a provincial town to make an absolute grant of the public lands to the extent of 15 leagues square, 20 times the area that could be included in a grant under the national and state colonization laws in force at the time, a tract comprising as much territory as is included in the states of Rhode Island and Delaware; in fact, a tract of land equal in area to a strip one mile wide, reaching from the city of New Orleans to the city of San Francisco. Land at that time may have been plenty, and next to

worthless, and people may have been very scarce, but then why the national and state colonization laws limiting grants?

The complainant contends, with regard to this power on the part of the alcalde, that it is to be presumed from the fact that he exercised it; that the burden of proof to show that he had no such power is on the defendants; and that, in fact, the alcalde had such power under the positive provisions of the laws of Chihuahua, referring particularly to a decree (No. 65) alleged to have been passed by the congress of Chihuahua on August 5, 1825, quoted in complainant's brief as follows:

> "Decree No. 65.
>
> "Relating to the Abolishment of Sub-Delegates.
>
> "The Honorable Constitutional Congress, etc., etc. First. The judges with the appointment of sub-delegates are hereby abolished, as in the system that governs us such appointments are unknown. Second. Their faculties shall be resumed by the constitutional alcaldes ('alcaldes de primera denominacion'), and in those towns where there is only one alcalde, they will also have judicial jurisdiction, as prescribed in former depositions, until the constitution establishes a fixed rule regarding the office.
>
> "Be it understood by the Governor of the State," etc.

Complainant also cites Hall's Mexican Law, p. 7, as follows:

> "Alcaldes, mayores and corregidores had, prior to the date of the Ordinance of Intendencias, December 4, 1786, and for nearly three centuries exercised the functions of magistrates of their respective partidos (districts), with political powers also. They acted as governors. In the matter of the sale and composition of land and water they were usually made sub-delegates."

In support of the presumption arising from the fact of an officer's making the grant that he has authority of law to do so, complainant cites authorities from the reports of the supreme court of the United States and of the supreme court of Texas, which, in the main, sustain his contention. U. S. v. Peralta, 19 How. 343; Gonzales v. Ross, 120 U. S. 605, 7 Sup. Ct. 705; Bryan v. Shirley, 53 Tex. 440; Blythe v. Houston, 46 Tex. 76; Jenkins v. Chambers, 9 Tex. 167; Jones v. Garza, 11 Tex. 186; Hancock v. McKinney, 7 Tex. 384. Probably the correct rule with regard to the presumption of authority in favor of an officer making a grant is that such authority is presumed where the documentary evidence of the grant comes from the proper archives, or where the genuineness is not in question. See U. S. v. Peralta, supra.

The defendants, in reply, admit that under the royal decrees of Spain, where persons in authority issued grants, the power was presumed from the existence of the grant itself, but with regard to Mexican grants a different rule obtained after the passage of the national colonization laws of August, 1824, and the regulations of 1828, and in the state of Chihuahua, of the colonization law of the 25th day of May, 1825, which was in strict conformity with the general laws of colonization of the republic of Mexico. That in the early cases in the supreme court of the United States (referring to U. S. v. Clarke, 8 Pet. 436) it is held that the power is to be presumed from the existence of the grant itself, but in all the later cases since the passage of the laws above mentioned it has been uniformly decided that no presumption can be indulged as to the existence of the power to make

the grant, but it must be conferred by the law, and be exercised in conformity with its terms. Referring to U. S. v. Cambuston, 20 How. 59; U. S. v. Vallejo, 1 Black, 541.

There can be no doubt that the rule claimed by defendants is recognized by the supreme court in all cases of grants claimed in California. U. S. v. Sutter, 21 How. 170; U. S. v. Hartnell, 22 How. 286; U. S. v. Vallejo, 1 Black, 541; U. S. v. Cambuston, 20 How. 59; U. S. v. Workman, 1 Wall. 745; Fuentes v. U. S., 22 How. 443.

It is said, however, that while California was a territory, and subject to the national colonization laws, the state of Chihuahua was a free and independent state, and owned and controlled its own public lands; the national laws not being applicable. It is to be noticed, however, that in 1825 the state of Chihuahua itself passed a law in strict conformity with the national colonization law. We therefore are unable to see why, subsequent to the 26th day of May, 1825, a different rule should prevail in the state of Chihuahua from that conceded to prevail in the territory of California with regard to the method and manner of disposing of public lands. On this question the learned judge of the circuit court said:

"In my judgment, if I follow the decisions of the supreme court of the United States, and if those decisions mean what they say, the alcalde had no power to make such concession at that date. In 1824, when Mexico threw off the Spanish yoke, and erected her own government, an entirely different system of distributing public lands was inaugurated, and under that system, and under the colonization law of 1825 of the state of Chihuahua, the alcalde had absolutely no authority to execute such a grant; not only a grant of 1,500,000 acres, but he was without authority to execute an 11-league grant. Therefore, upon its face, the grant is a nullity."

We agree with the circuit judge in this conclusion.

The next and main question in the case is whether the Ronquillo grant, alleged to have been made by Cesario Herrera January 25, 1832, was ratified and confirmed by the congress of the state of Chihuahua, September 24, 1834. Such a decree of ratification and confirmation would tend to show that Cesario Herrera, alcalde, made and executed the grant at the time alleged, and would eliminate from the case all question as to his power as alcalde to make and execute such a grant. It appears that in the complainant's original bill he set up and asserted a decree of confirmation to the Ronquillo grant, passed by the congress of Chihuahua on the 24th day of September, 1834, in substance as follows:

"The constitutional congress of the state of Chihuahua has deemed it proper to ratify and confirm the action of Sr. Cesario Herrera, alcalde of Presidio del Norte, on the 27th day of November, 1832, granting to Sr. Don Jose Ygnacio Ronquillo, lieutenant colonel of the active army, for distinguished military services, certain lands, pastures, and minerals situated on the left bank of the Rio Bravo del Norte, in front of Presidio del Norte."

This decree was assailed by the defendants as a forgery, and is now by both parties so admitted. In relation to this forged decree, the complainant, in his amended bill, after asserting that the grant was in all things duly ratified and confirmed by the congress of Chihuahua, says:

"Your orator further says that in their answer to the bill heretofore filed in this cause the defendants aver, on information and belief, that there was

no confirmation of the grant by the congress of Chihuahua, as herein heretofore alleged, but that a pretended circular letter, pretending to be a decree of such congress, confirming and ratifying the action of the senor alcalde at Presidio del Norte on the 27th day of November, 1832, in this bill heretofore described, as in the archives at Juarez, Mexico, and that the same is a forgery, and has been surreptitiously inserted and placed among said archives at Juarez. Your orator says that he has seen and inspected the paper so referred to by defendants in their said answer, and that he is convinced and says the same is a forgery, and not a true archive at said Juarez. Your orator further says that long before the purchase or negotiation for any interest in said property by this complainant or his immediate grantors, and long before your orator or his immediate original grantors knew anything of this property or its title, some one interested as by or through the heirs at law of one Ben Leaton and Juana Pedrasa y Leaton, his wife, surreptitiously abstracted from the archives of Juarez, Mexico, the true and genuine confirmation, previously one of the archives at that place, and, for the purpose of adding a supposed strength to the title at that time claimed by such heirs, forged a pretended decree somewhat differing from the real and genuine decree aforesaid in its wording, and surreptitiously put such forged and pretended decree into the stead and place of the former and genuine decree among such archives. That such paper is not now one of the archives at Juarez, but has been taken therefrom, and referred to one of the judges under the Mexican system of laws, to inquire into its genuineness, and your orator is not informed as to the result of such judicial inquiry; but that your orator makes no pretense that such pretended decree is genuine, and claims no manner of benefit or advantage of the same, but declares it is his opinion that it is a forgery, but that the confirmation referred to in your orator's bill is not a confirmation of the action of the alcalde done on the 27th day of November, 1832, but of the grant itself, made on the 25th day of January, 1832, and is not, therefore, the forged paper referred to in the defendants' said answer."

To this matter defendants answer:

"These defendants aver that they are not advised as to the person or persons who forged the circular letter pretending to be a decree of the congress of Chihuahua, confirming and ratifying the action of the senor alcalde at Presidio del Norte on the 27th day of November, 1832, in this answer heretofore described, and thereafter deposited in the archives at Juarez, Mexico; and therefore neither admit nor deny that the same was done by some person interested as by or through the heirs at law of one Ben Leaton and Juana Pedrasa y Leaton, his wife; but these defendants deny that any true and genuine confirmation, previously one of such archives at that place, was taken therefrom, and said pretended circular letter deposited in its place, as complainant in his said amended supplemental bill has alleged. And these defendants deny that any such paper confirming or ratifying said grant, purporting to have been made on the 25th day of January, 1832, or at any other time, was ever deposited or archived at Juarez, Mexico, or, if any such circular letter or decree confirming or ratifying said grant was ever archived at said place or elsewhere, then these defendants are informed and believe and so charge the same to be a forgery; and these defendants, for a greater certainty, crave leave to refer to said pretended executive decree confirming said grant, as alleged in said complainant's amended supplemental bill, when the same shall be produced. And these defendants further aver that the said pretended circular letter, or executive decree, ratifying or confirming said grant to Jose Ygnacio Ronquillo, was never authenticated, or proved for record, and was never duly recorded in any county in Texas, wherein said land is or was situated."

To prove the decree of confirmation by the congress of Chihuahua, alleged in the amended bill, the complainant produces the printed document, without written signature or marks, without seal or rubrics, or any other marks of attestation, found in duplicate in the archives of Santa Barbara, a mining town, about 250 miles from

the capital of the state of Chihuahua, and, so far as the evidence goes, found nowhere else in the archives of the state of Chihuahua, nor elsewhere in the republic of Mexico. The stipulation as to search for documents does not cover a search for evidence of a decree of confirmation, but it is a fair inference that, if complainant made search for in every proper place, and made inquiry of every person likely to know about the protocol, expediente, and testimonio of the grant, no existing evidence of a genuine decree of confirmation would have been overlooked. No proof is offered in the case tending to show that in the archives or records of the congress of Chihuahua there is any mention of the Ronquillo grant by way of memorandum, petition, letter, expediente, protocol, resolution, or decree. There is no evidence showing or tending to show that Don Jose Ygnacio Ronquillo himself ever had any knowledge or notice of any decree of confirmation. It does not appear that his widow, who survived him many years, ever heard of any such decree of confirmation. There is no proof tending to show that prior to the year 1887 the heirs of any Ronquillo, or any person or persons claiming title to the grant in question, ever made any claim, or pretense even, of a decree of confirmation. If the document recorded in Bexar county in 1851 is taken to be a genuine document, then it is clear that Ronquillo, in November, 1832, transferred the grant to Hypolito Acosta, who in turn transferred it to Juana Pedrasa. The decree of ratification was not annexed to the document so recorded.

In short, the weight of evidence in this case practically shows that a decree of confirmation was never heard of in connection with the Ronquillo grant prior to 1887, 53 years after the time in which it is now alleged that such decree was passed.

There is some evidence on the part of the complainant found in the testimony of Mr. Provencio, Mr. Siejas, and T. T. Teel to the effect that a genuine decree ratifying the grant of January 25, 1832, was on the files at Juarez some time during and after the year 1887. The evidence is offered in support of the theory of the complainant that a genuine decree was in the archives at Juarez, but in the interest of the Ben Leaton heirs it was surreptitiously removed, and a forged decree inserted in its place. The circuit judge analyzed this evidence, and reached the conclusion that what these witnesses then saw was the forged, and not any genuine, decree; and we agree with the reasoning and conclusion. That a forged decree was placed in the archives at Juarez is undoubtedly true, but it is hardly credible that any person claiming an interest under a doubtful Mexican grant, and having a genuine decree from the congress of the state of Chihuahua confirming the grant, would remove the genuine decree, and insert a forged one. That such a genuine decree was so removed is further negatived, almost conclusively, by the fact established by the defendants, that the genuine decree, corresponding to the number and date of the alleged decree of confirmation, which was on the files in its proper order, was a decree relating to public affairs of minor importance, not at all likely to be inquired or looked for after a period of 50 years.

The finding of the Santa Barbara decree in the nick of time is

seemingly so fortuitous as to be also suspicious. It appears that about the spring of 1887, one T. T. Teel, an attorney at law of San Antonio, Tex., learned of the record of the alleged testimonio, and, soon thereafter finding Isabella Shirley, surviving heir of Ben Leaton, and securing an agreement to divide recovery, in October, 1889, brought suit for the land. Thereupon one E. N. Ronquillo appeared and set up title to the property as heir at law of Jose Ygnacio Ronquillo, to whom the land was granted. The record shows that he was the son of another Jose Ygnacio Ronquillo, who died in 1860, but in no wise connected with the Jose Ygnacio Ronquillo to whom the grant is alleged to have been made, and who died in 1834. The record also shows that Teel had E. N. Ronquillo arrested for asserting a fraudulent claim, and such it seems to be from the evidence of both complainant and defendants in this case. As said by counsel for defendants: "He must have started out to acquire the land as heir at law of Ronquillo on the principle of idem sonans." The arrest of Ronquillo appears to have amounted to nothing more than to bring about a compromise or adjustment between the contending claimants by which the interest of Teel and of E. N. Ronquillo seem to be fully protected for all they are worth, each retaining an interest in the recovery in this case. Thereafter E. N. Ronquillo appears to have been employed by the complainant, who, it seems, had acquired the interests of all the claimants, to assist in finding evidence, and he testifies, as taken from the complainant's abstract of evidence:

"I have spent considerable time and money traveling to different points in Chihuahua to search archives and records, but not much for witnesses. Went as interpreter to Presidio del Norte with Mr. Owen. Went to Chihuahua and Santa Barbara to search records. Went to Santa Barbara with Mr. Foster in October, 1890. De la Garza, at Chihuahua, told us there were important records at El Valle. Foster telegraphed Owen to that effect, and received answer to go at once there. At El Valle we found nothing, but the priest and Jefe Politico there told us the most complete set of records in that neighborhood were at Santa Barbara, it being out of the way of revolutions, and its records not being burned. At Santa Barbara we applied to search records, and, after considerable discussion, permission was given by ayuntamiento for the secretary to search for us. He did so in our presence and found Confirmation No. 16, dated September 24, 1834, in duplicate. We obtained a certified copy, and also one of the duplicates, which we brought to complainant. Santa Barbara is a small mining town, about 250 miles from the city of Chihuahua. It is not the capital of any state at present, but was formerly capital of the state that is now Chihuahua."

Inez Franco, secretary of the municipality of Santa Barbara, testifies:

"That E. N. Ronquillo and Mr. Foster, from El Paso, Texas, came to Santa Barbara twice in search for a decree of confirmation of the Ronquillo grant; the first time in October, 1890, and the second time in November, 1890. The first search was made in October, 1890, at which were present Juan Pablo Baca, then president of the ayuntamiento, Jose Mesa, third regidor, E. N. Ronquillo, Foster, and myself. The second search was made in November, 1890, at which were present Leandro de Dios, who was then president of the ayuntamiento, E. N. Ronquillo, Foster, and myself. The second search was made principally by myself, but I was assisted to a greater or less extent by probably all who were present. The search was made at the instance of E. N. Ronquillo. Two copies, exactly alike, were found by me among

the regular files of the archives of the ayuntamiento of Santa Barbara, in a package containing all other archives for the year 1834, and E. N. Ronquillo took one of said duplicates away with him."

## Leandro de Dios testifies:

"I am president of the ayuntamiento of Santa Barbara. From January to October, 1890, inclusive, I was a simple member of the ayuntamiento, and from November, 1890, to the present time I have been president. In the month of October, 1890, E. N. Ronquillo and Mr. Foster were here for the first time, and then came again in November, 1890, who requested me to look among our archives here for an act of the congress of Chihuahua concerning a concession or grant of land to Jose Ygnacio Ronquillo, and we made the search as requested. Inez Franco was the secretary of the ayuntamiento at the time. E. N. Ronquillo and Mr. Foster made the search. They found the concession made by the congress of Chihuahua of the land to Jose Ygnacio Ronquillo, dated September 24, 1834, in the package in which were packed for preservation the archives for the year 1834. It was the first time I had ever seen the act. Inez Franco, the secretary of the ayuntamiento, assisted in the search for the decree, with Messrs. Ronquillo and Foster, and it was Mr. Franco who found the act."

## By stipulation of counsel it was agreed as follows:

"That the act or decree of confirmation referred to in the depositions of Inez Franco and Leandro de Dios was found as in said depositions related, on the first search made for the same, referred to in said depositions as made in the month of October. And that it shall be taken as if said witness had so testified, and the fact herein stipulated is to be taken and admitted as part of the evidence of this cause, as fully as if the witness Inez Franco and Leandro de Dios had so testified."

With regard to this stipulation, defendants' counsel claims that it amounts to no more than an admission that said witnesses Franco and De Dios would have testified that the document in question was found at the first search, and not by any means an admission that it was found at the first search. In this connection, however, we note that by the testimony of Franco and De Dios, Mr. Foster, who is known to be an intelligent lawyer in good standing at the bar in El Paso, assisted at both searches, and was present when the Santa Barbara decree was found, and yet he was not called as a witness to relate the circumstances attendant upon the finding of said decree. The absence of his testimony cannot be explained by the fact that he appears as one of the solicitors of record for the complainant in this case, because solicitors on neither side have been backward in testifying wherever their evidence was considered at all important. Our conclusion with regard to this point is that, while the evidence establishes that the Santa Barbara document was found at the time and place asserted by complainant, yet the circumstances attending upon the finding are not calculated to raise or strengthen any presumptions in favor of the genuineness of the document itself, but rather the reverse.

The complainant filed in the circuit court, and by assignments of error has renewed in this court, numerous motions to suppress evidence. The record is not made up in such a way that these motions to suppress can be intelligently reviewed, and reasons given for sustaining or denying the same, without great labor. The motions, however, may be summarized in three classes, as follows:

First. To suppress the depositions of Juan de Dios Vasquez and

some 10 others, because of irregularity in the commission issued by the clerk of the circuit court, who is said in the motion to have issued the commission in the name and by the authority of the state of Texas. The commissions appear to have been issued under a stipulation of counsel which, as it appears in the record, the clerk of the circuit court is not to be blamed for misunderstanding. We consider the objection to be to a great extent technical, and doubt very much whether, if good, it would render the commissions wholly void. We are precluded, however, from ruling upon this class of motions to suppress, because the parties have not seen fit to bring up in the record a single one of the commissions objected to for our examination.

Second. Motions to suppress, based on alleged illegality and irrelevancy of interrogatories propounded by counsel for defendants; and, irrelevant, incompetent, and illegal answers made by witnesses respectively. This class of objections is not pressed in the complainant's brief, nor discussed for the defendants, and may be treated as abandoned.

Third. Motions to suppress depositions, wholly or in part, of defendants' alleged expert witnesses. Of this class of motions we are disposed to think that they should be partly sustained and partly overruled, but we make no ruling on the matter, not considering the same necessary. We remark, however, that the question in hand is not a question of handwriting. There is neither signature, rubric, sign, nor mark of any ink (other than print) upon the document found in the archives of Santa Barbara, and offered in this case as a muniment of title. It is a printed paper throughout, claimed to be an archive in the records in Santa Barbara, and from that fact alone to be presumed to have been issued by the governor, or rather to be a true and genuine copy of a decree issued by the governor.

The question in the case is one of connecting the governor and other state officials with the printed document. As is well said by the counsel for the defendants: "It is a question of whether the archives of Mexico can be invoked to connect a public official with a printed document purporting to be his official act; and, if so, whether similar archives of Mexico can be invoked to repel this presumption." In suits for the establishment of Mexican grants, the supreme court holds that the Mexican archives are public documents which the court has a right to consult, even if not made formal proof in the case. See U. S. v. Teschmaker, 22 How. 392; and see Luco v. U. S., 23 How. 515; Romero v. U. S., 1 Wall. 721. In cases of this kind, if the court has the right to consult the public archives, it follows from the fact that the court cannot go to the archives, nor in many cases the archives be brought to the court, that the only way the archives can be examined by the court is through intelligent witnesses, who make such examination, and thereafter give their evidence; and, if such evidence is permissible, we can see no reason why it cannot be corroborated and illustrated and sustained by officially certified copies, and, a fortiori, by duly-proved photographic copies. And further, we add that the burning question for expert evidence in the case is as to the age of the printed paper pro-

duced, and on that question experts in paper, printing, printer's ink, and type would best meet the demands of the case.

To establish the genuineness of the printed copy of decree of confirmation found at Santa Barbara, the complainant filed with such copy a certificate of one J. Melchor de la Garza to the effect that the decree was printed by him in the official printing office of the state, of which printing office he was a director, and at the time expressed therein. The depositions of J. Melchor de la Garza were afterwards obtained, first by the complainant, and then by the defendants; and the pertinent part of said depositions is as follows:

"(3) What was your occupation in the years 1834 and 1835? Ans. The management of the printing office of the state government for the printing done there for the same." "(5) How were the acts of congress in Chihuahua published and made official in 1833, 1834, and 1835? Ans. The decrees and resolutions of the congress in these years, as well as those of the previous and subsequent years, were and are sent to the government, who sent them to all the authorities of the state for compliance and observance with the same, either printed or in manuscript. (6) State whether a printed paper was shown you lately, purporting to be an act of congress of Chihuahua, made in 1834, with reference to a grant to Jose Ygnacio Ronquillo, purporting to confirm the same to him. Ans. It was shown to me by Mr. E. N. Ronquillo. (7) If you saw such a paper, where and when did you see it? Ans. I saw it at my house, and it was shown to me by Mr. Ronquillo several months ago." "(9) If you know, you may state where it came from,—what archives. Ans. I cannot say where it came from, but Mr. Ronquillo told me that he had obtained it in the town of Santa Barbara. (10) State who printed the paper or had it printed. Ans. I have already said that it belongs to a class of documents which were then, and are still, printed by order of the government; and the one to which we now refer, judging by its date, must have been printed by me, as manager of the printing office at that time." "(12) State what, if anything, you know of the type it was printed with and the paper used. Ans. I cannot say anything in respect to this." "(14) From your examination of the paper, when do you say it was printed? Ans. The date of that paper itself states it precisely. (15) From your examination of that paper, and any fact you may know concerning it, do you say it is an original and genuine and official act of the congress of Chihuahua, or a spurious or false or forged copy? Ans. I cannot say or affirm anything in this respect." "Cross Interrogatory 3. If you say that said printed paper came from the archives of Santa Barbara, state how you know that it came from said archives. Did you see it among the archives? If so, when did you first see it there? And when, and by whom, was it put there? Were you present when a search was made for it at Santa Barbara? And did you see it delivered to the person who afterward showed it to you? Ans. I have never said that such documents belong to the archives of Santa Barbara, a place which I do not know; and I could not very well affirm that it existed among those archives, nor when it was extracted therefrom, or for whom, nor to whom it was delivered, or with what object. Mr. E. N. Ronquillo showed it to me, stating that he had obtained it at that point, but without telling me who had given it to him. Cross Int. 4. If you say that you compared said printed paper with another printed paper, please attach to your answers the printed paper with which you compared the paper that was shown to you, so that we may see the resemblance; also please attach the paper that was shown to you, or, if you cannot attach it, state why you cannot. Ans. I have already stated in answer to interrogatory 18 that I cannot attach the original copy asked for, because I have the same forming a book with other documents of which I do not wish to deprive myself. I returned to Mr. Ronquillo the document which he showed me, and I certified at the foot thereof that the said document had been printed by me on account of my having acted as manager of the printing office at the time in which it was published and circulated by the government to the authorities of the state, and for this reason I cannot attach a document which is neither in my possession nor belongs

to me, but to Mr. Ronquillo, who is the person who should have it. But I attach hereto a photograph of the said document, which will be found marked 'Exhibit A.' "

Second deposition:

"(2) If you are the same person whose depositions were taken in said cause, please state whether or not you have in your possession a certain book containing official documents, a decree printed by you in the year 1834. If yea, is there now, or was there at the time you gave your former deposition, any executive decree No. 16, promulgating an act of congress of Chihuahua, confirming a grant of land to Jose, Ygnacio Ronquillo, or any document whatever, relating to said grant in said book? Ans. Yes. He has the collection of decrees referred to in the first part of the second question, but there is no decree No. 16 in the same that refers to the concession of land made to Col. Jose Ygnacio Ronquillo." "Now, please state if you intended to testify in said answer that you had at that time any printed paper or document in said book confirming the grant of Jose Ygnacio Ronquillo, or having any relation thereto. If not, explain fully what you intended to say in answer to said interrogatory. Ans. I said, when answering the interrogatory 18, to which reference is here made, I did not intend to signify that I had any decree in my collection relative to the concession made to Col. Ronquillo, but only that the decree which was presented to me by Lawyer Ronquillo seemed to be the same type and of the same time that I was in charge of the government printing office." "Cross Int. 5. When this paper was shown you at the city of Chihuahua, some time previously to the taking of your testimony, did you not at that time then and there say to E. N. Ronquillo that upon comparison of this paper with another like it that you thought it was genuine, and that it had been printed by you in 1834, and that you were willing to certify to the same, and did you not then and there take this paper, and write in your handwriting upon it the words included in cross interrogatory No. 4? Ans. I only certified that the decree presented by Mr. Ronquillo was like the type and bore the same date as the ones I have in my collection of the same time."

This evidence falls far short of establishing the fact that De la Garza, as official printer, printed in the government printing office, state of Chihuahua, in the year 1834, the copy of the alleged decree of the congress of Chihuahua confirming the Ronquillo grant. The evidence is worth, at most, that of a more or less qualified expert who gives an opinion that the copy presented by the complainant is genuine.

The testimony of expert witnesses offered by the complainant to sustain the genuineness of the document found in Santa Barbara, taken with that of the expert witnesses offered by the defendants and not attacked by the complainant in his motion to suppress, as a whole, is of such a character, and so conflicting, that the non-expert, after reading and considering it, cannot intelligently say on which side the truth lies. Certain it is, the preponderance is not in favor of the complainant.

On September 24, 1834, the date on which it is alleged the decree of confirmation of the Ronquillo grant was passed by the congress of Chihuahua, the state of Chihuahua was divided into 11 partidos, of which the partido of Parral included the mining district of Santa Barbara. The president of the ayuntamiento of the chief town in the district was the political chief, and, with the ayuntamiento, administered the government of each pueblo or municipality in the district; and it was alone through them that all communications were

made, and all orders and decrees sent by the governor to the president of each municipality in the district. The ayuntamientos were required to keep a register of all deeds of land, either public or private, in their districts, and were required to make and keep an exact inventory of all the public archives in their respective places or towns. The laws and decrees of congress, when printed and signed by the governor and secretary of state, were sent to the political chief of the district, who was required to distribute them to his own ayuntamiento, and to the several towns and municipalities in his district, and to take receipts for all decrees distributed by him. See Laws of Congress, State of Chihuahua, January 5, 1826. All decrees, therefore, that were sent to Santa Barbara in 1834 should have been, and probably were, sent through the political chief of the partido of Parral, and the same decrees should be also found in the archives of Parral when found anywhere in the district, and the receipts for such decrees should also be found at Parral, and the inventory and registry of both Parral and Santa Barbara should show that any decree properly found in the archives at either place had been duly filed, and the date thereof. Evidence of this character in relation to the decree in question is entirely wanting in this record.

Complainant's case, then, as to the genuineness of the printed copy of the decree of confirmation of the Ronquillo grant found in Santa Barbara in 1890, depends entirely upon the document itself, and the place where found. It is not aided by the circumstances attendant upon the finding; nor by the testimony and certificate of Melchor de la Garza, the alleged printer; nor by the weight of opinion on the part of competent experts; nor by evidence that the existence of such a document was, or ever had been, of record elsewhere, or was known by interested parties, or had ever been the basis of transactions between parties in relation to the Ronquillo grant; nor by evidence tending to show that the congress of Chihuahua ever passed, or considered even, any decree relative to said grant; nor by evidence showing that any genuine decree of confirmation was ever in any of the public archives in Mexico. Suspicion and doubt attach to the case, because a duly-authenticated copy is nowhere found, and seems never to have been heard of. No similar copies of such decree of confirmation are found in the public archives or elsewhere. No such decree of confirmation was claimed or asserted by anybody prior to the institution of this suit. It is a conceded fact that the public archives in Juarez, Mexico, were invaded in the interest of the claim now asserted, and a false and forged decree placed in the archives in such a manner as to obtain full credit, so far as forming a part of the public archives is concerned. The document is irregularly, if not falsely, numbered, the alleged number 16 belonging to a genuine decree of the same day, month and year; and the confirmation of the Ronquillo grant by the congress of Chihuahua involved a violation of the state and national policy in regard to the disposing of public lands as declared in the colonization laws of 1824, 1825, and 1828. In view of all of which the learned judge of the court a quo, in his opinion dismissing the complainant's bill, said:

"Considering the circumstances of this case, and the conflict of opinion between experts, and my own examination of these papers, I am thoroughly satisfied that the Santa Barbara decree is a forgery. I can draw no other conclusion consistent with the facts and circumstances of this case."

If the genuineness of the document in question is admitted so far as fabrication, date, and place of deposit are concerned, still it is only secondary and circumstantial evidence, and, in the absence of other proof tending to show that the congress of Chihuahua in the year 1834 took some action in regard to the Ronquillo grant, is of not sufficient value and authenticity to establish the alleged decree of confirmation, when taken in connection with the established fact that for more than 50 years no claim of title by and under such decree was asserted by any of the persons under whom the complainant claims title. See U. S. v. Castro, 24 How. 346; Romero v. U. S., 1 Wall. 721; Pico v. U. S., 2 Wall. 279. The printed paper produced, although it may be a genuine circular letter distributed for information, is not authentic, does not import verity, does not prove itself, and never was intended, unauthenticated, to make proof. A congressional decree confirming a doubtful grant is a law as well as a grant, and should be promulgated and proved as other laws. The constitution of the state of Chihuahua of 1825, tit. 7, art. 45 (translated), is as follows:

"The governor shall publish the law under this formula: 'N. of the governor of the state of Chihuahua to all of its inhabitants. Know ye, that the congress of said state has decreed the following: [Here a literal copy of the law], to the end that he command it to be printed, published, promulgated and executed in all of its parts. [The date, the name and signature of the governor and secretary of state].'"

Article 46 (translated) is as follows:

"Article 46. The governor will circulate the laws authenticated by the secretary of state, without which requisite they shall not be obeyed."

And article 74, tit. 13, of the same constitution, is as follows:

"The decrees, resolutions and ordinances of the governor shall be issued, signed by the secretary of state, without which requisite they shall not be obeyed."

The act of the congress of Chihuahua of the 18th of February, 1826, (arts. 35, 36, and 37), prescribing the duties "Del Secretario del Despatcho," provides as follows:

"Art. 35. The secretary shall be the first chief of his office. Art. 36. He shall authenticate with his full signature all those proceedings that are signed by the governor, and shall use his signature when the governor shall do the same. Art. 37. He shall authenticate all copies which emanate from the office of secretary in his charge."

From these specific provisions as to promulgation of laws and decrees it would seem that proof of congressional decrees, as well as of decrees, resolutions, and ordinances of the governor, could and should be taken as proved only when properly signed and attested with name and signature (evidently by hand) of the governor and secretary of state.

Our impression of the complainant's case, after patient and careful investigation of some 1,900 printed pages of record and abstracts, with the aid of 566 pages of printed brief and three days of oral argu-

ment by very able and experienced solicitors, is substantially as follows:

In 1832-33, Don Jose Ygnacio Ronquillo, lieutenant colonel, was an active and enterprising officer in command of the frontier of the upper Rio Grande, at which time, probably, and on the ground of military services, he applied for a land grant. It is probable that several, and perhaps all, of the preliminary steps were taken to secure to him such a grant, and it is more than probable that Cesario Herrera, about that time alcalde of the town of Presidio del Norte, had knowledge of Ronquillo's application, and perhaps, as alcalde, was called on to aid in some of the preliminary steps; but the troubled condition of the border, with the departure and subsequent death of Col. Ronquillo, in 1834, resulted in the abandonment of the proceedings, and in the abandonment of the grant. Matters remained in this shape some 16 years,—until after the close of the war between the United States and Mexico, resulting in the acknowledgment of the title of the state of Texas to all that part of the state of Chihuahua lying north of the Rio Grande,—when the enterprising Ben Leaton appeared upon the scene, became acquainted with Cesario Herrera, former alcalde, and between them the Ronquillo grant was resurrected, and located on an immense territory in western Texas. A testimonio was concocted, with such transfers as would permit Leaton to assert title, and a persistent effort was made by Leaton to secure and record a recognition of the Ronquillo grant. It was then that the record in San Antonio was obtained, the survey by Howard was made, and the map, hereinbefore referred to, marked "Ben Leaton's Claim," deposited in the land office of the state of Texas. The efforts of Leaton and his agents were kept up until 1854-55, notwithstanding the arrest of Cesario Herrera, formerly alcalde, on the charge of manufacturing false titles, about which time Ben Leaton died. Again there was an abandonment and a period of quiet with regard to claimants under the Ronquillo grant until about 1887-88, when, western Texas land becoming more valuable,—important silver and other mines being discovered and developed,—the Ronquillo grant was again resurrected, and put forward as a genuine claim for the immense tract involved. The value of the property in question with the chances presented to speculative lawyers and other parties naturally inspired the most pertinacious and industrious efforts to prove up the claim. One great value of the property being in its silver mines, and, silver mines not passing by ordinary land grants under the government of Mexico, it was necessary to show title direct from the sovereign, which would convey the minerals. Such title could only be secured by a decree of the congress of the state,—a matter that it seems Cesario Herrera and Ben Leaton had overlooked in preparing the testimonio and transfers,—and therefore was concocted the admitted forged decree placed in the archives of Juarez, forming the original basis of complainant's suit, but purporting to be signed in writing, with rubrics attached, by the governor and secretary of state, and afterwards (again profiting by experience) was found the Santa Barbara copy, wholly in

print, with no tale-telling signatures or rubrics; both of which alleged decrees convey full title to all the minerals found in the tract.

It is proper to say that, in so far as this record goes, the present complainant, Mr. Owen, is to be acquitted of all knowledge of or complicity in the matter of all doubtful efforts and transactions entered into to establish the validity of the Ronquillo grant. His good faith is apparent, and it is to be regretted that his persistent efforts to maintain his case, with his very able, candid, and industrious exposition of the same, cannot be rewarded.

In our opinion, the decree of the circuit court dismissing the complainant's bill was correct, and should be affirmed, with costs; and it is so ordered.