THE UNITED STATES, APPELLANTS, *v.* HENRY F. TESCHMAKER, JOSEPH P. THOMPSON, GEORGE H. HOWARD, AND JULIUS K. ROSE.

Where none of the preliminary steps required by the act of 1824 and regulations of 1828 have been observed or shown, as there required, previous to the grant, and no record of the title, as also there required, and but slight evidence of possession, either as to value or permanency, the proof of the genuineness of the official signatures to the grant is not sufficient. Evidence, under the circumstances of grants in California, should be given so as to make the antedating of the grant irreconcilable with the weight of the proof; otherwise, there can be no protection against imposition and fraud.

The record of the title must be shown, or its absence accounted for to the satisfaction of the court.

THIS was an appeal from the District Court of the United States for the northern district of California.

The state of the title and a brief summary of the evidence are given in the opinion of the court.

It was argued by the Attorney General and *Mr. Stanton* for the United States, and by *Mr. Gillet* for the appellees.

The counsel for the United States stated the case, both as to the nature of the title and the evidence to support it, and then summed up the whole as follows:

Claimant derives title through Salvador and Juan Antonio Vallejo.

*October* 11, 1838.—Salvador Vallejo and Juan Antonio Vallejo petition their brother, M. G. Vallejo, who is styled by them "commandante general and director of colonization of this frontier," to grant eight leagues to each of them.

*March* 15, 1839.—Permission to occupy the lands they petitioned for, given by M. G. Vallejo.

*September* 5, 1844.—Grant by Micheltorena of sixteen leagues, more or less—"La Laguna de Lup-Yomi." Micheltorena's name is signed to the grant. No attestation by secretary, but at the foot is this:

"Note has been made of this decree in the proper book, on folio 4. In the absence of the commandante,

"FRANC'o C. ARCE."

Salvador Vallejo testifies that he and his brother got leave to occupy the land from another brother. Immediately after this permission was obtained, they stocked land with horses, cattle, and hogs. Afterwards, applied to the Governor for a title; it was sent him (S. Vallejo) by a courier. Swears that a map produced is true, but don't know if it was presented to the Governor when title was asked for. Does not say that he credited the Government with $2,500, or any other sum, out of his pay.

Juan Castenada knows the ranch was granted to the two Vallejos about 1844 or 1845, and they proceeded to occupy the land immediately after the grant, namely, in 1844 or 1845; yet he admits he knows nothing about the execution of the paper, and never was on the place in his life! This swift witness testifies, without hesitation, to the handwriting of all the Vallejos, of Micheltorena, and of Arce, being all the names on all the papers.

William D. M. Howard testifies to handwriting of Vallejo, Micheltorena, and Arce.

*United States* v. *Teschmaker et al.*

Salvador Vallejo (called again) testifies that he stocked the farm and built houses, &c., on land in 1842 or 1843, and solicited title from the Governor in 1843 or 1844; applied to Alcalde José de la Rosa for judicial possession. Rosa was afraid of Indians. When asked what the houses cost, he answered, "A great deal of meat and spunk."

José de la Rosa was appointed alcalde June 22, 1845; June 25, was called on by Salvador Vallejo to give judicial possession of Lup-Yomi; did not do so, merely because "there was a large revolution among the Indians," which continued until the middle of August; nobody killed.

José Ramon Carillo testifies that the boundaries of the ranch were natural, mountain and lake; occupied by stock in 1842 or 1843.

This constitutes the whole of the evidence. It will be seen that the grant, if made at all, was made without any previous petition, investigation, reference, or report; no map; no order of concession; no registry. Arce's certificate, (or the certificate with his name to it,) that note had been taken of this title in the proper book, is false. The proper book is here, and it contains no such thing. There is not a vestige or trace of this title, or anything like it, to be found among all the records of the Department.

This title was never produced, nor its existence publicly asserted, in any way whatever, before the 25th August, 1852, when the deed from Salvador Vallejo to the claimants was acknowledged before a notary. The deed from Juan to Salvador Vallejo is dated the 30th of December, 1849, but it was not acknowledged or recorded; nor does it appear ever to have been seen by anybody but the parties.

Salvador Vallejo and Carillo, their brother-in-law, swear that there was a sort of possession in 1842 or 1843, with some improvements, which, the former witness says, cost a great deal of meat and spunk. But they do not say, and there is no reason to believe, that the title now set up was exhibited, or the land claimed under it. Juan Castenada says the possession was not taken until after the grant in 1844 or 1845.

1. The grant is illegal, for want of a petition, map, inquiry, &c.

2. It is not proved, because a grant produced from the private custody of the claimant, without any record of it among the archives, is no grant at all.

3. It is false, forged, fabricated.

If it had been really made by the Governor at the time it bears date, why was it not recorded? Why was the false note of Arce placed at the foot of it?

The bad character of the Vallejos, as well as of their principal witnesses, renders it extremely probable that all the papers, including the petition for license to occupy, the license itself, and the pretended grant from the Governor, are sheer fabrications, fraudulently got up long after the change of Government.

The chief of the Vallejos (General Mariano) was a professional witness, until his credit ran down so low that he was no longer worth calling. In the case of Luco v. the United States, it was proved that he had forged a grant; and the claim under it was rejected, on that ground alone.

Juan Castenáda is a well-known professional witness. So is Francisco Arce, who falsely certifies that this grant was recorded in the proper book.

The grant is dated in September, 1844. That was the very time at which the Vallejos were banding themselves and their followers against Micheltorena, to drive him from the country, and he knew it. It is not probable that he was making grants of valuable land to them at such a time.

*Mr. Gillet,* for the appellees, considered the following positions to be established by the evidence in the case:

I. A grant was made by Governor Micheltorena to Salvador and Juan A. Vallejo, on the 5th of September, 1844, for the premises in question.

II. The grantees settled upon and occupied the land granted.

III. Judicial possession was not given, because the magistrate applied to was afraid of the Indians.

IV. The United States offered no evidence in this case on any point, by way of contradiction or explanation, or otherwise, but left that of the claimants wholly unquestioned.

Under such circumstances, where the claimants made distinct proof of a fact, if they swore but a single witness to prove it, they had a clear right to consider such fact sufficiently proved, and this court must so consider it.

V. No objection was raised before the board, except that the conditions subsequent had not been performed, and that the localities and boundaries were not given with sufficient definiteness, and these were removed by testimony taken in the District Court.

Each of these positions was sustained by reference to the evidence, after which *Mr. Gillet* proceeded to divide his argument into several points, of which only two will be reported, as being those upon which the decision of the court turned :

VI. By the laws, usages, and customs of Mexico, a grant is valid, whether the usual preliminary formalities were observed or not.

The act of 1851, (9 U. S. L., 633, sec. 1,) under which these proceedings were had, provides that the board and courts shall be "governed by the treaty of Guadalupe Hidalgo, the law of nations, the laws, usages, and customs of the Government, from which the claim is derived, the principles of equity, and the decisions of the Supreme Court, as far as they are applicable."

The grantees' rights are the same under the treaty and the laws of nations. Whatever rights they had, whether perfect or imperfect, full and complete or otherwise, are protected under both.

In equity, all rights, whether legal and perfect, or equitable and imperfect, are protected, and can be enforced. Congress declared that those having rights of any kind should have all the advantages that a court of equity could decree them. The rules applied in equity cases should apply in these. It is a well-settled rule that a court of equity cannot apply its powers to confirm or enforce a forfeiture, while there is another which requires it to exert them, whenever practicable, to prevent forfeitures, and to set them aside, and to relieve against them in all proper cases.

In these land cases, except where the title is a strictly legal

*United States* v. *Teschmaker et al.*

one, the whole case is an equitable one, and the court deals exclusively in equitable principles, and enforces them. Every right which is not strictly legal is equitable, and its extent is immaterial.

The claimant shows that he has received some sort of title from the Government, and calls upon the courts, under the law of 1851, to confirm it. Here he is met by a claim of forfeiture, and, in the exercise of equity powers, the court is requested to enforce it. The law is too well settled that this cannot be done, to require the citation of authorities.

In the present case, the grant cannot be questioned. But it is objected that there were formalities usually observed which were omitted. If these were required by positive law to confer a legal title, they are not required to create an equitable one. If these had been observed, the Assembly having confirmed, the title would have been a legal title, and beyond the control of the Government, except where a third party had secured rights by denouncement for non-performance of conditions. In this case, the proof shows that everything has been done that was required by the strictest practice, if we except the presentation of a petition, &c. But there is no law declaring even the legal title void, if there was no petition; much less can it be void in equity. Something was done, and a title was given. This clearly creates an equitable right. The party received and acted upon it. He took possession and occupied under it. Is there anything to defeat this equitable right? No subsequent act is set up by the Government or a third party for that purpose. All that can be said against it is this: that it was not acquired with the formalities which are supposed to be necessary to create a complete legal right.

But no one will contend that an equitable right is invalid because it was not acquired in the same manner that is required to vest legal rights, because, if that were so, an equitable right could not be acquired at all, for all rights would then be legal rights. The very object of a court of equity is to relieve in those cases which are defective, under the strict rules of law.

Mexico did not sell her lands. She gave them away to have

them used, and they were principally used for raising horses and cattle. This very grant was applied to that purpose as soon as it was safe to put cattle and horses there, and as early as Fremont took possession of the Alvarado grant. The Government got all it expected from this or any other grantee. If Mexico had not ceded to the United States, there can be no pretence that, under her usages and customs, this grant would have been held a nullity by her judicial or other authorities. No one claimed it by denouncement. If, in September, 1844, the grantee had any interest, either equitable or legal, nothing has been done by Mexico, or her grantee, the United States, to defeat or annul it. The latter could not do so. Could Governor Micheltorena, the day after making this grant, have declared it null and void, and have taken the land from the grantee, and made it a part of the public domain? Clearly not. In Reading's case, (18 How., 1, 7,) this court said: "In other words, from our reading of these decrees, the Governor could not either directly recall a grant made by him, or indirectly nullify it, when it had been conformably with them, the laws and regulations." If he could not, then the grant must be held to convey an interest which has not been and now cannot be taken from the grantee. When Mexico ceded to us, the power to take away a grant by denouncement ceased. There is no law by which the United States can take away lands which have been granted; or authorize any one to do so. Their rights, and those of the grantees, now stand just as they did on the day the treaty was made. If these grantees then had any right in equity, they have it now. That they then had some right, and were in the occupation of the lands under it, cannot be denied, and consequently they now have the same, and the court must confirm it.

IX. The regulations specifying preliminary steps to be taken in applications for grants are merely directory, and may be dispensed with without vitiating the grant.

The regulation of November 21, 1828, is as follows:

"2. Every person soliciting lands, whether he be an *impressario*, head of a family, or single person, shall address to the Governor of the respective territory a petition, setting forth

his name, country, profession, the number, description, religion, and other circumstances, of the families or persons with whom he wishes to colonize, describing as distinctly as possible, by means of a map, the lands asked for."

There is no provision declaring that the grant shall be invalid if there is no petition to the Governor, in writing, specifying the various particulars thus enumerated. Every part of these directions, including the furnishing a map, stands upon the same ground. The regulation merely directs what is deemed proper to be done, but declares no consequences if there shall be omissions. Being merely directory, if not strictly pursued, it does not affect the rights of the party receiving the grant. It is not probable that, in all the cases confirmed by this court, there is one where the petition has conformed in every particular with this regulation. By the regulation, a map is just as essential as a petition. It is a highly important document. But it appears only in a part of the cases before this court. It was not shown in Ritchie's, Arguello's, or Peralta's case, Reading's, or Fossat's, or Fremont's case. On the contrary, in the latter case the petition showed there was no map, and an excuse was offered for not presenting one. This court held that the map was not essential, and confirmed the grant made without it. In 17 How., 561, the Chief Justice said: "According to the regulations for granting lands, it was necessary that a plan or sketch of its lines and boundaries should be presented with the petition; but, in the construction of these regulations, the Governors appear to have exercised a discretionary power to dispense with it under certain circumstances. It was not required in the present instance. The reason assigned for it in the petition was, the difficulty in preparing it, the land lying in a wilderness country, on the confines of the wild Indians. This reason was deemed by the Governor sufficient, and the grant issued without it; and in deciding upon the validity of a Mexican grant, the court could not, without doing injustice to individuals, give to the Mexican laws a more narrow and strict construction than they received from the Mexican authorities who were intrusted with their execution. It is the

duty of the court to protect the rights obtained under them, which would have been regarded as vested and valid by the Mexican authorities. And, as the Governor deemed himself authorized, under the circumstances, to dispense with the usual plan, and his decision in this respect was sanctioned by the other officers intrusted with the execution of the law, it must be presumed that the power he exercised was lawful, and that the want of a plan did not invalidate the grant. The fact that the country where the land was situated was such a wilderness, and bordered on such dangerous neighbors, that no plan could then be prepared, is proved by these documents; and that fact, officially admitted, is worthy of consideration, when we come to the inquiry whether there was any unreasonable delay in taking possession; for, dispensing with the plan or draft on that account, which was a condition precedent, it may justly be inferred that the conditions subsequent were not expected by the Governor to be performed, nor their performance intended to be exacted, until the state of the country would permit it to be done with some degree of safety."

Now, if the Governor can dispense with one condition precedent, or requirement of the regulation, he can with another, without rendering the title invalid in equity. The omission here is no greater than in Fremont's case, and the same indulgence must be shown.

In the United States *v.* Sutherland, (19 How., 363, 364,) this court said:

"In construing grants of land in California, made under the Spanish or Mexican authorities, we must take into view the state of the country and the policy of the Government. The population of California, before its transfer to the United States, was very sparse, consisting chiefly of a few military posts and some inconsiderable villages. The millions of acres of land around them, with the exception of a mission or a rancho on favored spots, were uninhabited and uncultivated. It was the interest and policy of the King of Spain, and afterwards of the Mexican Government, to make liberal grants of these lands to those who would engage to colonize or settle

upon them. Where land is plenty and labor is scarce, pasturage and raising cattle promised the greatest reward with the least labor. Hence; persons who established ranchos required and received grants of large tracts of country as a range for pasturage for their numerous herds. Under such circumstances, land was not estimated by acres or arpens. A square league, or 'sitio de ganado mayor,' appears to have been the only unit in estimating the superficies of land. Eleven of these leagues was the usual extent for a rancho grant."

Mr. Justice NELSON delivered the opinion of the court.

This is an appeal from a decree of the District Court of the United States for the northern district of California.

The case involved a claim to sixteen square leagues of land known by the name of "La Laguna de Lup-Yomi," situate north of Sonoma, in the county of Napa, California. It was presented to the board of land commissioners on behalf of the appellees, who derived their title from the two brothers, Salvador and Juan Antonio Vallejo, claiming to be the original grantees of the Mexican Government. The board rejected the claim, but, on appeal to the District Court, and the production of further evidence, that court affirmed it.

The first document produced is a petition of the two brothers, S. and J. A. Vallejo, to the senior commandant general and director of the colonization of the frontiers, for a grant of eight leagues of land each, reciting that they were desirous of establishing a ranch in the Laguna de Lup-Yomi, situate twenty leagues north of this place, (Sonoma,) which tract is uncultivated, and in the power of a multitude of savage Indians, who have committed and are daily committing many depredations; and being satisfied that the tract does not belong to any corporation or individuals, they earnestly ask the grant, offering to domesticate the Indians, and convert them by gentle means, if possible, to a better system of life. Salvador Vallejo adds, that being in actual service in quality of captain of cavalry, and not having received his pay, he proposes to apply $2,500 out of his pay for his portion of the

land. This petition was dated at Sonoma, October 11th, 1838.

Under date of March 15th, 1839, the senior commandant general, M. G. Vallejo, a brother of the petitioners, accedes to their petition so far as to permit them to occupy the tract, but, for the accomplishment of the object, they must hasten to ask a confirmation from the Departmental Government, which will issue the customary titles; and, at the same time, they must endeavor to reduce the wild nature of the Indians, assuring them that the Government wishes a treaty and friendship with them.

The next document is a title, in form, granted by the Governor, Micheltorena, dated Monterey, 5th September, 1844. At the foot of the grant is a memorandum, as follows:

"Note has been made of this decree in the proper book, on folio 4.

"In the absence of the commandante,

"FRANCIS. C. ARCE."

The signatures of M. G. Vallejo to the permit of occupation, and of Micheltorena and F. C. Arce, the Governor and acting secretary, are genuine, if three witnesses are to be believed— Castenada, W. D. M. Howard, and Salvador Vallejo, one of the original grantees. The proof of possession and occupation is slight, and not entitled to much consideration, in passing upon the equity or justice of the title, or even upon its bona fides.

This proof rests mainly upon the testimony of S. Vallejo. He was examined twice on the subject—once when the case was before the board of commissioners, and again when on appeal before the district judge. In his first examination, he states, that immediately after permission was given to occupy the ranch (March, 1839) he placed on the land about one thousand head of cattle, between three and four hundred head of horses, and from eight hundred to one thousand head of hogs; that he built a house on the land the same year, and also corrals, and left an overseer and servants in charge of the place.

In his second examination, he states, that in the year 1842 or 1843 he placed cattle on the ranch, built a house and corrals, and in the year 1843 or 1844 received a title for the land; that he then lived on it, but was frequently absent visiting his house and lot in Sonoma, and his other farms, but always left a mayor domo on the ranch; and during this time he cultivated beans, corn, pumpkins, watermelons, &c. The last house he built on the place was about the time the country was invaded by the Americans. That during the time mentioned he had on the place from 1,500 to 2,000 head of cattle, 500 to 600 head of horses, and from 1,500 to 2,000 head of hogs. He further states, that most of his stock was subsequently stolen and driven off by the Indians and emigrants. This evidence is slightly corroborated by the testimony of Castenada and Carillo.

From the numerous cases that have already been before us, as well as from our own inquiries into the customs and usages of the inhabitants of California, especially those engaged in the business of raising cattle and other stock, this mode of occupation furnishes very unsatisfactory evidence of possession and cultivation of the land in the sense of the colonization laws of Mexico. Any unappropriated portion of the public lands was open to similar possession and occupation without objection from the public authorities. Indeed, according to the laws of the Indies, the pastures, mountains, and waters, in the provinces, were made common to all the inhabitants, with liberty to establish their corrals and herdsmen's huts thereon, and freely to enjoy the use thereof, and a penalty of five thousand ounces of gold was imposed on every person who should interrupt this common right. (2 White's Recop., 56.)

There is also a fact stated by the witness Vallejo himself, that is calculated to excite distrust as to the extent of the possession and occupation, and for the purpose stated. He says that there were constant revolutions among the Indians at the time; that it was unsafe for families to live there, and that the alcalde at Sonoma refused to deliver him judicial possession in 1845, on account of the danger.

It is quite apparent, also, from the testimony of this witness, that the huts built for the herdsmen of the cattle were of a most unsubstantial and temporary character. No possession of any kind is shown since the cattle and other stock were carried off by the Indians and emigrants. When that took place does not appear; but doubtless as early as the first disturbances in the country, in the fore part of the year 1846.

The possession and occupation, therefore, even in the loose and general way stated, was only for a comparatively short time.

We have said that the signatures of the officers to the documentary evidence of the title are genuine, if we can believe the witnesses—Castenada, Howard, and Vallejo; but, as all of these officials were living after the United States had taken possession of the country during the war, and even after the cession by Mexico, and, with the exception of the Governor, resided in California, these signatures may be genuine, and still the title invalid. It was practicable to have made the grant in form genuine, but ante-dated.

The permit to take possession of the tract, in connection with the short and unsubstantial character of the possession, is not of much importance in making out the claim. Vallejo had no power to dispose of the public lands. We do not understand that his permission to occupy, as director of colonization on the frontiers, laid the Governor or Mexican Government under any obligations to grant the title. If followed by valuable and permanent improvements, considerations might arise in favor of a claimant that should influence a Government, when called upon to grant the property to another. We think, therefore, that the claim rests chiefly, if not entirely, upon the grant of the title by the Governor of the 4th September, 1844.

This grant stands alone. None of the usual preliminary steps pescribed by the regulations of 1828, such as the petition, marginal reference for a report as to the situation and condition of the land, report of the proper officers and minute of concession, were observed. These, with satisfactory proof of the signatures to the papers, give some character to the grant, and

tend to the establishment of its genuineness. Even the permit of Vallejo is not noticed by the Governor, nor any present occupation of the premises by the grantees.

So far, therefore, as respects the title, or even any rightful claim to the tract, it depends mainly upon proof of the signatures of Micheltorena and of F. C. Arce, the acting secretary. There is no record of the title in the proper book, shown in the case, nor exists in fact, as it is understood this book of records exists for the years 1844, 1845, and no record is there found. The memorandum, therefore, at the foot of the grant, by Arce, the secretary, "Note has been made of this decree in the proper book, on folio 4," is untrue. Nor has there been found any approval of the grant by the Departmental Assembly, for those records are extant, as found in the Mexican archives. These archives are public documents, which the court has a right to consult, even if not made formal proof in the case. The absence of any record evidence is remarkable, if the title is genuine, as one of the grantees, Juan Antonio Vallejo, resided at the time in Monterey, where these records were kept, and where all the formalities of a regular Mexican grant might readily have been complied with. The parties, also, were men of more than ordinary intelligence, and belong to one of the most influential Mexican families of the Territory, and doubtless well understood the regulations concerning grants of the public domain.

The non-production of this record evidence of the title, under the circumstances, is calculated to excite well-grounded suspicions as to its validity, and throws upon the claimant the burden of producing the fullest proof of which the party is capable of the genuineness of the grant. We do not say that the absence of the record evidence is of itself necessarily fatal to the proof of the title; but it should be produced, or its absence accounted for to the satisfaction of the court.

We have already said, that the genuineness of the official signatures to the paper title might be established, and yet the title forged, and stated our reasons. Proof of the genuineness of these alone can never be regarded as satisfactory. It must be carried farther by the claimant. The record proof is, gener-

ally speaking, the highest. Possession and occupation of some duration, permanency, and value, are next entitled to weight.

At least, satisfactory evidence should be required, under the circumstances in which most of these Mexican grants were made, as to make the ante-dating of any given grant irreconcilable with the proof; otherwise, there can be no protection against imposition and fraud in these cases.

· The decree of the court below reversed, and the case remanded for further evidence and examination.