In re Title of Pa Pelekane, 21 Haw. 175.

# IN THE MATTER OF THE PETITION OF THE TERRITORY OF HAWAII TO REGISTER AND CONFIRM ITS TITLE TO CERTAIN LAND SITUATE IN LAHAINA, ISLAND OF MAUI, TERRITORY OF HAWAII, AND KNOWN AS PA PELEKANE.

APPEAL FROM COURT OF LAND REGISTRATION.

SUBMITTED MAY 29, 1912.            DECIDED JULY 10, 1912.

ROBERTSON, C.J., PERRY AND DE BOLT, JJ.

RECORDS—*registration of title to land—nature of proceeding.*

A proceeding to bring land under the statute providing for the registration of titles partakes of the nature of a suit in equity, and it is not correct practice in such a proceeding to dismiss the application at the close of the petitioner's case on the motion of respondent unless the respondent also rests.

SAME—*failure of proof—amendment of pleadings.*

Where, in such a proceeding, the application sets forth a claim of title in fee simple absolute and alleges a source of title which is legally invalid, but no objection was raised to the form of the pleading, any evidence tending to prove the general claim of title in fee simple is admissible, and the matter of amending the application may remain in abeyance until the close of the evidence.

EMINENT DOMAIN—*power to exercise—privy council.*

A resolution of the privy council of the Hawaiian Kingdom that certain land "be and is hereby confirmed as government property and that Governor Kekuanaoa's claim therefor is hereby negatived," adopted in response to an adverse claim by Kekuanaoa on behalf of another individual for the land mentioned, was not intended to be and was not an exercise of the power of eminent domain.

PUBLIC LANDS—*acquisition of private title.*

The title to land which was never awarded by the land commission nor granted by the government remains in the government. The Mahele of 1848 did not confer title on the chiefs to the lands therein set apart to them.

SAME—*award of land by name.*

The award of an ahupuaa by name only would not pass title to a piece of land which, though originally a portion of the ahupuaa,

had, prior to the award, been permanently detached from and taken out of the ahupuaa.

EVIDENCE—*judicial notice.*

The former governments of the Hawaiian Islands are not to be regarded as foreign governments. The courts of this Territory take judicial notice of the laws of Hawaii which were enacted prior to the annexation of the islands by the United States, as well as of the principal facts of Hawaiian history, and the public records of the Hawaiian government when called to the attention of the court.

OPINION OF THE COURT BY ROBERTSON, C.J.

This is an appeal taken by the Territory from a judgment made and entered by the court of land registration denying and dismissing its application to have registered a fee simple title to a parcel of land situate at Lahaina, Maui, known as "Pa Pelekane," containing an area of 2.28 acres. In response to the usual notice given in such cases several persons appeared and filed answers. Among the respondents who thus appeared were the trustees under the will and of the estate of Bernice P. Bishop, deceased, who claimed title in fee simple to the land described in the petition except a portion thereof theretofore conveyed by them to one E. K. Nahaolelua, the ancestor of some of the respondents. The other respondents set up claims to distinct portions of the land and some of them denied that the Territory had any title in or to any of the land described in the petition. The third paragraph of the petition sets forth, "That the Hawaiian Kingdom obtained title to said property on August 29, 1850, by a resolution of the Privy Council reserving and confirming the said Pa Pelekane as Government property, said resolution being on file in the office of the Department of Public Lands of the Territory of Hawaii, in Vol. 3, p. 427, of the Privy Council Records, and the Territory of Hawaii obtained title to said property by virtue of its political succession to the said Hawaiian Kingdom."

The Territory's contentions are recapitulated in the attorney

general's brief as follows: "(1) That this land of Pa Pelekane had, prior to the Mahele, been set apart by the King as Government land for the use of the Government. (2) That if the Government had not acquired title by eminent domain prior to the Mahele, it did acquire such title by virtue of certain resolutions of the Privy Council purporting to confirm the same as Government land, some of these resolutions being made after the Mahele, but prior to the land commission award to Victoria Kamamalu, others being after the award, but prior to the issuance of the patent. (3) That the land of Pa Pelekane was not situated within the ancient boundaries of the Ahupuaa of Paunau. (4) That even if it was located within the ancient boundaries of Paunau, yet that this land of Pa Pelekane was what is known as town lots or house lots within the class denominated as being situated in Hilo, Lahaina or Honolulu, and so did not pass by the grant of the Ahupuaa, and (5.) That the Territory, as successor to the Kingdom of Hawaii, has obtained title to this lot by prescription."

At the hearing counsel for the Territory offered in evidence the resolution of the privy council referred to in the application claiming that it was evidence of "the exercise of the right of eminent domain," and also of the fact that the land in question "had always been government land." The respondents objected to the evidence and it was rejected. The Territory had failed to prove the source of title set up in its application, but certain evidence as to adverse possession was before the court and that tended to show that the petitioner was entitled to a registered title to a part, at least, of the land described in the application. Considerable evidence as to possession by and under the government was offered and much of it was admitted—some without objection and some over objections as to its competency. The claim of title by adverse possession was inconsistent with the claim that the land in dispute was never the subject of private ownership, and evidence of possession need not have been offered except in reply to an affirmative showing of title on the part of

the respondents. If Pa Pelekane was never awarded by the land commission and had not been sold by the government the title remained in the government and it was not necessary for the Territory to show that the government had had possession. However, the evidence was received and the court was bound to consider it.

At the close of the case for the Territory, the respondents, without resting, moved that the application be dismissed on the ground that the petitioner had failed to establish or support the material allegations of the petition, and had failed in its proof. The court granted the motion. The procedure was improper. A proceeding to bring land under the operation of the law providing for the registration of titles is of the nature of a suit in equity, and the rules of equitable procedure generally apply. In equity it is not correct practice for the court to dismiss a bill at the close of the complainant's case, on the motion of the respondent, unless the respondent also rests. *Territory* v. *McCandless,* 16 Haw. 728; *Texeira* v. *American D. G. Assn.,* 17 id. 41; *Estate of K'eaho,* id. 308. But as pointed out by the *Texeira* case, if it appears that the plaintiff is not entitled to relief under the pleadings and evidence a decree of dismissal will not be reversed because of the error. It will be necessary, therefore, to ascertain whether in this case the petitioner was entitled to any relief. The statute (R. L. Sec. 2414) requires that the application shall contain "a description of the land, with a statement of whether an absolute, a qualified, or possessory title is required." The form of application given in the statute, which is permissive, contains the following paragraph: "That I (or we) obtained title (if by deed, state name of grantor, date and place of record, and file the deed, or state reason for not filing. If in any other way, state it)." The claim made in the Territory's application was for "the legal estate in fee simple absolute" while the source of title was given as already explained. Assuming that no title was or could have been derived by or through the resolution of the privy council, the de-

In re Title of Pa Pelekane, 21 Haw. 175.

fect in the application was apparent on the face of the pleading and presented a question of law. The point was one which should have been raised by pleading. It is immaterial here whether the objection might have been made by demurrer, exception, or answer, but if the respondents intended to rely on the point they should have raised it in some way before the hearing. However, they did not raise it until after the hearing had begun. Besides some oral testimony and formal proofs, a mass of documentary evidence was offered, all but such as the court considered admissible on the question of adverse possession being rejected. The evidence admitted tended to show that the successive governments of these islands had occupied and used, apparently under claim of right, certain portions of the land in dispute for a great many years and longer than necessary to have acquired title by adverse possession if the land had previously been held in private ownership. Most of the respondents concede that adverse possession was shown as to the land covered by the lighthouse and the wharf site, but they claim that the Territory is not entitled to have its title registered as to those portions of the land because no offer or attempt to amend the application was made so as to limit the claim to those portions and to define them. It is in this connection that the error in granting the motion to dismiss is made clear. The court always has power to dismiss a bill of its own motion where there has been a total failure of proof, but in a case where there is only a partial failure of proof, or it appears that the plaintiff is entitled to some relief, the court, acting *sua sponte*, should not dismiss the bill without giving the plaintiff an opportunity or option to amend if an amendment be necessary to enable the plaintiff to obtain the relief to which the evidence shows him to be entitled and is allowable under the rules relating to amendments. Under the circumstances shown it was not incumbent on the Territory to ask leave to amend the application. The matter of amendment should have been left in abeyance until the respondents had rested their case and the evidence was all in. The error requires the reversal of the judgment.

The rejection of certain evidence offered by the Territory which we believe ought to have been admitted furnishes an additional reason for reversing the judgment. We think that the failure of the respondents to make objection to the form of the application with reference to the statement of the source of petitioner's claim of ownership required the admission of all such legal evidence as was offered in support of the general claim of title in fee simple. The reference to the resolution of the privy council of August 29, 1850, did not state a source of title, and at this stage the allegation may be regarded as surplusage, but the claim of ownership in fee simple absolute was alleged and the Territory was entitled to prove it if it could.

The writer, speaking for himself only, is of the opinion that the contention advanced on behalf of the Territory that the privy council at the time referred to (or at any time for that matter) possessed the power of eminent domain is not sustained. The right of eminent domain is an inherent prerogative of sovereignty, though under civilized governments its exercise is usually regulated by express law. "The power to take private property for public uses, generally termed the right of eminent domain, belongs to every independent government. It is an incident of sovereignty, and, as said in *Boom* v. *Patterson,* 98 U. S. 106, requires no constitutional recognition. The provision found in the Fifth Amendment to the Federal Constitution, and in the constitutions of the several States, for just compensation for the property taken, is merely a limitation upon the use of the power. It is no part of the power itself, but a condition upon which the power may be exercised." *United States* v. *Jones,* 109 U. S. 513, 518. In the early history of these islands the power resided, of course, in the King. This was recognized in the "Principles adopted by the Board of Commissioners to Quiet Land Titles" (1846) wherein, in the enumeration of the sovereign prerogatives affecting lands, was included the power "to resume certain lands upon just compensation assessed, if for any cause the public good or the social safety requires it." But the exer-

cise of the power was not restricted by law until the constitution of 1852 provided that "no part of the property of any individual can, with justice be taken from him or applied to public uses without his own consent, or that of the King, the Nobles, and the Representatives of the people. And whenever the public exigencies require that the property of any individual be appropriated to public uses, he shall receive a reasonable compensation therefor." The declaration in the constitution of 1840, which has been adverted to by counsel, that, "Protection is hereby secured to the persons of all the people, together with their lands, their building lots, and all their property, while they conform to the laws of the kingdom, and nothing whatever shall be taken from any individual except by express provision of the laws," did not, in my opinion, affect the sovereign right of eminent domain. From a royal edict of June 7, 1839, which was enacted by legislative authority on November 9, 1840, it would appear that the King had exercised the power (if the phrase is applicable to conditions then existing) through the chiefs. The act referred to is that which provided for the restoration of "all residuum lands," which had been separated by the chiefs, to the lands to which they formerly belonged, excepting, however, building lots, royal demesne lands, and "places which have been taken by the chiefs for the public interests of the King." As the act was passed before private titles to land were formally recognized by law little importance would attach to it did it not show the understanding of the time that any parcel of land which had been taken for and was devoted to public purposes should no longer be regarded as an integral part of the larger land from which it had been so separated, and, therefore, that title to it would not pass with the award or grant of the larger land by name only. The right to exercise the power of eminent domain may be delegated, but there is no evidence of its ever having been conferred upon the privy council. The constitution of 1840 contained no reference to a privy council. The act of October 29, 1845, entitled "An Act to Organize the Executive Ministry

of the Hawaiian Islands," provided for a privy council consisting of the King's five ministers, the governors, *ex officio,* as honorary members, and such other honorary members as the King, with the attestation of the Premier, might appoint, which should convene at the call of the King and Premier.    As thus established, the privy council was a part of the executive branch of the government with powers of an advisory nature.    The act provided that after discussion in council all acts of an executive nature should emanate from the King and be countersigned by the Premier.    Certain acts of the executive required the concurrence, or approval of the council, and subsequent statutes conferred a great variety of duties of an executive nature upon the council, but they were mainly of a negative character, merely requiring its consent or approval to certain acts.    Article 35 of the constitution of 1852 provided that all official acts of the King, other than the approval of laws, should be approved by the privy council.    At no time did the privy council possess legislative powers. *Territory* v. *Liliuokalani,* 14 Haw. 88.    The provision of the statute of May 31, 1841, referred to in the Territory's brief, that between sessions of the legislature the King, the Premier, and "the Nobles resident near" could pass laws which should be in force until the next meeting of the legislature, did not refer to the privy council.    The act of 1845 expressly provided that "it shall in no case be indispensable to the validity of an executive sanction that a law be first submitted to the privy council." Among the important functions of the privy council were those conferred upon it by the early statutes with reference to land matters.    The King, with the advice and consent of the council, fixed the amount of the commutation to be paid to the government, in each case, upon the issuance of royal patents to land. Proposed purchases of land by the minister of the interior for government purposes were required to be submitted to the King in privy council for approval.    Leases of government lands to private parties were made by the minister of the interior with the "approbation of the King and upon vote of the privy coun-

In re Title of Pa·Pelekane, 21 Ha,w. 175.

cil." Rights to quarry stone were granted by His Majesty in privy.council, and the minister of the interior with the approbation of the privy council was authorized, to lay restrictions on the taking of timber from the forests. The act of June 7, 1848, authorized the minister of the interior, upon the approval of the King in privy council, to dispose of the lands by that act set apart to the government. The Territory endeavored to introduce evidence of acts done by the privy council which, it was contended, could not be ascribed to any express grant of authority, and therefrom it has been argued that all the powers of the privy council were not embodied, in express statute. Some of those acts are referable to the powers mentioned, others. are not. But the privy council could not enlarge its own powers by exceeding the authority granted to it by law, and there is nothing in the law to justify a ruling that the council possessed the power of eminent domain. We hold, however, that the resolution of August 29, 1850, should have been received as competent evidence in support of the claim that Pa Pelekane (otherwise called Beretania) had previously been taken, set apart and held by the government for public purposes. Two other resolutions of the privy council which were offered in evidence but refused admission were also competent as tending to show the same thing. On March 5, 1850, upon the application of one H. Swinton to purchase the land, it was "Resolved, that Pelekane in Lahaina, Maui, be not sold to H. Swinton as it is a place to which many historical associations are attached, and which has already .been set apart as a place not to be sold." On May 16, 1850, upon the application of H. S. Swinton to lease the land, it was "Resolved, that the lot Beretania, in Lahaina, applied for by Mr. Swinton be not sold or leased as the government may require it for public buildings." Both of those acts were done within the scope of the council's authority as the approving power to sales and leases of government land. The resolution of August 29, 1850, had reference to a claim submitted by Governor Kekuanaoa on behalf of Princess Victoria Kamamalu. It

was "Resolved, that the premises known as Beretania, in La-
haina, Maui, be and is hereby confirmed as government property
and that Governor Kekuanaoa's claim therefor is hereby nega-
tived." As already said, that resolution did not constitute an
exercise of the right of eminent domain. We think it was not
so intended. But, as also stated above, it was evidence that the
land was held by the government as public property. In re-
sponse to a claim for the land made against the government
through the council it was competent for the council to make the
declaration which the resolution embodied. To look at it from
the opposite point of view: If the privy council had recorded
its approval of the Kamamalu claim, and thereafter until the
institution of this case the government had not exercised or as-
serted any claim to the land, we have no doubt but that the action
of the council would have been competent evidence in favor of
those succeeding to Kamamalu's title. In this connection, as
corroborative evidence, reference may be made to a joint resolu-
tion passed by the legislature on July 6, 1852, whereby the min-
ister of the interior was authorized to establish a battery and
mount guns on the land of Beretania.

The contention of the respondents is that the land in dispute
is a part of the ahupuaa of Paunau which was set apart to Vic-
toria Kamamalu in the Mahele of 1848; that said ahupuaa was
awarded, pursuant to the Mahele, by the Land Commission on
April 7, 1854 (L. C. A. 7713); and that upon that award Royal
Patent 4775 was issued to Victoria Kamamalu on April 3, 1861.
The respondents, most of whom claim under the award, urge
that the resolutions of the privy council could not affect the
title so granted to Kamamalu. The award and patent, how-
ever, conveyed the land without survey or description other than
the name "Paunau." The claim that Pa Pelekane was a part of
the ahupuaa of Paunau is based on the opinion of the examiner
of the court to whom the Territory's application had been re-
ferred for investigation and report. At the same time the re-
spondents decline to concede any force to the examiner's further

opinion that "the petitioner has a good title as alleged and proper for registration." Whether facts found and reported by an examiner of titles, acting under the statute, are to be regarded as evidence upon the hearing of a contested case we need not decide, but we take it to be clear that the examiner's opinions, though properly expressed in the course of his report, or as the result of his investigations, are not evidence for or against a party upon a trial of the issues. There was no evidence before the court that the ahupuaa of Paunau as known and understood at the time either of the Mahele or of the land commission award included Pa Pelekane. The question would be what passed by the award rather than what was referred to in the Mahele. As frequently held, private titles were not acquired by the Mahele, but upon the awards of the land commission subject to which the Mahele was understood to have been made. *Kenoa* v. *Meek,* 6 Haw. 63; *Thurston* v. *Bishop,* 7 Haw. 421; *Atcherley* v. *Lewers & Cooke,* 18 Haw. 625. The evidence offered by the Territory tended to show that Pa Pelekane was unawarded land and that the title was in the government, and would, in the absence of any showing that it was included in the ahupuaa of Paunau and passed by the award to Kamamalu, or was the subject of some other award or grant claimed under by the respondents, entitle the Territory to the registration of the title. The Territory did not have to negative the claims set up in the answers of the respondents. *Glos* v. *Hoban,* 212 Ill. 222; *McMahon* v. *Rowley,* 238 Ill. 31.

This controversy, upon its merits, involves two principal questions, viz.: (1) Did the title to Pa Pelekane ever pass into private ownership by any award or grant, and (2) If the land was ever the subject of private ownership, has the government acquired title thereto, or any part thereof, by adverse possession. These issues may be tried under the pleadings as they stand, subject to possible amendment of the application to conform to the facts as they may appear at the close of the case. Included in the first general question are the other questions, as to what

are the boundaries of Pa Pelekane; and whether Pa Pelekane was originally a part of the ahupuaa of Paunau, and if so, whether it was detached from and taken out of the ahupuaa prior to the date of the award to Kamamalu. Counsel for the respondents have cited the case of *In the Matter of the Boundaries of Pulehunui*, 4 Haw. 239, where it was held that an award or grant of an ahupuaa or ili by name would pass title to whatever was included in such tract according to its boundaries as known and used from ancient times. There can be no doubt as to the correctness of the principle there laid down as a general rule, and there was no occasion in that case to consider any exception to the rule. That there are exceptions to it is shown by other cases decided by this court. See *Keelikolani* v. *Robinson*, 2 Haw. 522; *Kanaina* v. *Long*, 3 Haw. 332; *Harris* v. *Carter*, 6 Haw. 195. Any admissible evidence which may be offered by the Territory tending to show that, within the principle of the cases referred to, Pa Pelekane, though originally a part of Paunau was not included in the award of that ahupuaa, should be received.

It will not be necessary to consider all of the numerous objections lodged by the appellant against the rulings of the court below in rejecting evidence offered by the petitioner. It is apparent from what has been said that many of those rulings were erroneous. Upon the new trial which will be had they will be corrected, and others not touched upon may not be repeated. We will refer briefly to some of the more important documentary evidence which was offered. The record of the proceedings of the privy council of May 24, 1859, referring to the petition of Governor Kekuanaoa asking that the land of Beretania be restored to Princess Kamamalu was admissible as evidence tending to show that at that time the government was in possession of the land in question. Land commission award 8559 to Kanaina, dated March 31, 1855, describing a piece of land at Lahaina purporting to adjoin government land which, it is claimed, is the land in dispute, would be admissible if supplemented

by testimony showing its location to be as claimed. It would tend to prove the boundary of Pa Pelekane along the line described, and, what perhaps is more important from the standpoint of the Territory, it would go to show that the land in dispute had not been previously awarded by the land commission. Certain entries in the cash books of the department of the interior of the Hawaiian government, purporting to have been made during the years from 1879 to 1882, showing the receipt of rent from tenants of portions of Pa Pelekane, where admissible in connection with other evidence showing that the persons named in the entries were in possession of portions of the land. The books were shown to be official records of the government kept in the usual conduct of the office, being produced from the proper repository, and the entries were shown by a witness to have been made in the usual course of duty by clerks of the department of whom the witness was one, the other being dead. The showing made was quite sufficient. 1 Greenleaf, Ev., Secs. 483, 485.

One ruling made by the court below in the course of the hearing prompts us to advert to another point. The court expressed the view that the former governments of these islands were, as to the present government, foreign governments. That is a mistaken view. The courts of this Territory should take judicial notice of the laws of Hawaii which were enacted at any time prior to the annexation of these islands by the United States. So also as to the principal facts of Hawaiian history. The supreme court has decided that where a country has been acquired by the United States the laws which prevailed there prior to the acquisition are not regarded as foreign laws but those of an antecedent government which the courts of the United States will take judicial notice of. *United States* v. *Perot,* 98 U. S. 428; *United States* v. *Chaves,* 159 U. S. 452. In *United States* v. *Teschmaker,* 22 How. 392, 405, it was held that official records of the Mexican government kept in the archives at Monterey, California, are public documents which the court has a right

to consult even if not made formal proof in a case. And in *Lowrey* v. *Territory of Hawaii*, 19 Haw. 123, 125, this court "referred to proceedings of a public nature of which it would ordinarily take judicial notice, and to documents from the public archives when specifically referred to in the exhibits on file."

The judgment appealed from is reversed and a new trial granted.

*Alexander Lindsay, Jr., Attorney General,* and *A. G. Smith, Deputy Attorney General,* for the petitioner.

*Holmes, Stanley & Olson, Castle & Withington, J. Lightfoot, Larnach & Robinson,* and *R. P. Quarles* for the respondents.

OPINION OF PERRY, J., CONCURRING IN PART AND DISSENT-
ING IN PART.

In the petition for registration it is alleged that "the Territory of Hawaii has the power of disposing of the legal estate in fee simple absolute" of the parcel of land situate at Lahaina, Maui, known as Pa Pelekane, which is the subject of the proceeding. If this were the only allegation on the subject, the Territory would doubtless be at liberty to present, under the pleading and without amendment, proof of derivation of its title from any legal source or sources whatever; but the allegation does not stand alone. It is followed by the statement that "the Hawaiian Kingdom obtained title to said property on August 29, 1850, by a resolution of the Privy Council reserving and confirming the said Pa Pelekane as government property, said resolution being on file in the office of the Department of Public Lands of the Territory of Hawaii in Volume 3, page 429, of the Privy Council records and the Territory of Hawaii obtained title to said property by virtue of its political succession to the said Hawaiian Kingdom." The later statement qualifies the first and is to be read as a part of it. It is immaterial that the two are in separate paragraphs. The allegations read together are in effect an assertion that the fee simple absolute which the Territory claims as the successor of the Kingdom was derived by the

Kingdom under the resolution referred to. If it is found as matter of law that the resolution was not an exercise of the power of eminent domain and did not have the effect claimed for it, the whole averment of title fails and without amendment evidence of the derivation of title from other sources would be inadmissible. It may be that under the statutes relating to the registration of titles to land it was not incumbent on the Territory to specify the source of its title but having voluntarily done so it undertook, under the ordinary rules of pleadings and procedure, to prove the title as alleged and to confine itself to that issue,—subject always, of course, to its right to amend under the statute. None of the respondents, however, demurred to the petition nor was the point raised at the trial. Without objection on the ground just mentioned, evidence was offered and received to show (a) the acquisition of title by the Kingdom and the Territory by adverse possession as well as by eminent domain by virtue of the resolution of the Privy Council and also, perhaps, (b) by continuation of the ancient title of the king in his successors by reason of the absence of any award or patent. Since in any event a new trial is to be granted on other grounds, the Territory should under these circumstances and in view of the liberal provisions of the statute in this respect be now permitted to amend its petition so as to cure the defect above noted and render admissible evidence of any lawful claim of title which it may deem fit to present.

The presentation and the admission of evidence of the acquisition of title by the petitioner by adverse possession, during its case in chief, while at the same time it was claiming that the land remained unawarded, was not inappropriate or erroneous. Whatever rule is ordinarily followed in actions of trial of title to land, the Territory was at least not required to refrain from presenting its evidence of adverse possession until its case in rebuttal. The offer of the evidence was an appropriate precaution against the possibility of a successful motion to dismiss

based upon the weakness in law or in fact of the other claims advanced.

One of the contentions of the Territory at the trial and in this court is that the Kingdom derived title by virtue of the power of eminent domain exercised by means of a resolution of the Privy Council adopted August 29, 1850, and reading: "Resolved, that the premises known as Beretania in Lahaina, Maui, be and is hereby confirmed as government property and that Governor Kekuanaoa's claim therefor is hereby negatived." It is unnecessary to consider whether or not the Privy Council possessed in 1850 or at any other time the power of eminent domain. Assuming for the purposes of this appeal that it did, a sufficient answer to the contention now under consideration is that the resolution was not an exercise of that power. It did not on its face purport to be. On the contrary, it clearly appears from its language that it was not. It is recorded in the minutes of the proceedings of the council for the day named that "Kekuanaoa on behalf of Victoria claimed a piece of land called Beretania and a wharf lot in Lahaina that had belonged to Kaahumanu" and that "it was acknowledged on all hands that Victoria was the heir of Kaahumanu." Then follows the resolution and there is no other reference to the subject. The terms of the resolution and of the preamble expressly negative the view that private property was thereby taken. What the record of the council shows is that a private individual claimed the land as successor in interest to Kaahumanu, that the council conceded in the claimant's favor that she was the heir of Kaahumanu but declared that in spite of that admission the land was the property of the government and that the individual's claim was therefore "negatived" or denied. The resolution was a distinct assertion that the title was already in the government and that Victoria's claim could not be acquiesced in. This is further emphasized by two earlier resolutions of the Privy Council, also offered in evidence by the Territory. Under date of March 5, 1850, the record shows: "Mr. Lee

brought forward his" (H. Swinton's) "application and the following resolution was passed: 'Resolved, that Pelekane in Lahaina, Maui, be not sold to H. Swinton as it is a place to which many historical associations are attached and which has already been set apart as a place not to be sold.' " On May 16, 1850, the proceedings were: "Mr. Armstrong brought forward the application of Mr. H. S. Swinton to lease a piece of ground in Lahaina; Resolved that the lot Beretania in Lahaina applied for by Mr. Swinton be not sold or leased as the government may require it for Public Buildings." This language is irreconcilable with the view that the Council intended by the resolution of August 29, 1850, to condemn or take property which belonged to another. It tends to show that the Council believed that the property belonged to the government and refused to sell it or to lease it or to sanction any hostile claim to it.

So, also, the resolution of August 29, 1850, if it was intended as legislation, did not operate as a limitation of the power of the Land Commission to award the land to a private individual. The Privy Council did not possess legislative powers. *Territory* v. *Liliuokalani,* 14 Haw. 88.

The three resolutions were admissible, however, as evidence in support of the claim that Pa Pelekane was not at the date of the Land Commission award a part of the ahupuaa of Paunau and was not, therefore, by that award granted to Victoria Kamamalu. It is well settled that an award of the Land Commission, unappealed from as by the law then in force provided, is final and binding and not subject to collateral attack but it is not an infringement of this rule to ascertain, with or without the aid of extrinsic evidence as the case may be, and to declare the identity and the extent of the land described or named in the award. What were the ancient boundaries of the ahupuaa of Paunau is not necessarily the sole inquiry, in this respect, in the case at bar. It may be that Pa Pelekane, though originally a part of Paunau, was not at the date of the award a part of the ahupuaa. I concur in what is said in the opinion of the chief

In re Title of Pa Pelekane, 21 Haw. 175.

justice on this branch of the case and with reference to the admissibility of the three resolutions, the evidence of claim, occupation and use by the government and other evidence as tending to throw light on the issue of whether or not Pa Pelekane is still unawarded land.

I concur also in the views expressed by the chief justice relating to judicial notice of the laws of Hawaii enacted prior to annexation and of the principal facts of Hawaiian history, and to the admissibility of official records preserved in the government archives; in the rulings in detail concerning the erroneous exclusion of other evidence specifically referred to; in the views that the examiner's opinions are not evidence upon a trial of the issues in a contested case, that evidence (more than a scintilla) was offered by the Territory tending to show (a) that Pa Pelekane was unawarded land and (b) that as to certain parts at least of Pa Pelekane title if it had ever passed by the award, had been acquired by the government by adverse possession, and that petitions for registration are amendable so as to conform to proof of title of a part only of the land claimed; and in the conclusion that a new trial should be granted.

### CONCURRING OPINION OF DE BOLT, J.

As to the disposition of the question of eminent domain I concur in the views as expressed by Mr. Justice Perry. In all other respects I concur in the opinion of the chief justice.