## IN THE MATTER OF THE RECEIVERSHIP OF SECURITY TRUST COMPANY, LIMITED, AND A CLAIM BY JOHN CHALMERS.

### No. 1787.

ARGUED FEBRUARY 24, 25, 1928.     DECIDED MARCH 22, 1928.

PERRY, C. J., BANKS, J., AND CIRCUIT JUDGE CRISTY IN PLACE OF PARSONS, J., DISQUALIFIED.

OPINION OF THE COURT BY BANKS, J.

On February 21, 1922, the Henry Waterhouse Trust Company, Limited, was appointed receiver for the Security Trust Company, Limited, an Hawaiian corporation having its principal place of business at Hilo. John Chalmers, the petitioner in the instant case, being a creditor of the trust company, filed with the receiver two statements of his claim against the trust company. The first statement was filed on April 1, 1922, and the second statement was filed on July 16, 1925. Both claims were for the sum of $16,828.22 with interest at the rate of eight per cent per annum from January 1, 1922. The apparent reason for filing the second claim was that in pursuance of a legislative enactment of 1925 and in pursuance of an order of the circuit court of the fourth circuit the receiver published a notice calling upon all persons having claims against the trust company to file their claims, duly verified, within a specified time. There is no question that Chalmers filed his claim within the time speci-

fied 'in the notice nor that it was duly verified. There is also no dispute as to the correctness of the amount of the claim nor as to the fact that it has not been paid in whole or in part. On the 22d day of April, 1927, Chalmers filed in the circuit court of the fourth circuit a petition alleging in substance that his claim belonged to that class of obligations which, under certain statutory provisions which we shall mention later, is entitled to preferential payment, and praying that the receiver be ordered to classify it and pay it out of the funds of the trust com-. pany available for that purpose. The circuit judge de-.cided adversely to Chalmers and entered a decree dismissing his petition. From this decree Chalmers appealed and the case is now in this court for determination.

Before taking up the questions that are of vital importance to the parties we will dispose of a matter of procedure adopted by the circuit judge, to which our attention has been called and upon which it is desired that we express an opinion.

At the conclusion of the evidence presented in behalf of Chalmers (the petitioner) the receiver, without offering any evidence, rested the case and thereupon moved for the dismissal of the petition. Counsel for Chalmers objected to this procedure on the ground that the receiver having rested without offering any evidence the only question presented was whether under the law and the evidence before the court the petitioner was entitled to the relief prayed for, and that he was entitled, under well established practice, to open and close the argument. The circuit judge, however, took a different view and the motion was heard, counsel for the receiver opening and closing the argument. An exception was taken to this ruling but no request is made for a reversal of the final decree on the ground that the ruling was error, but we are asked to state for the guidance of inferior courts

what in our opinion should have been the procedure under the circumstances.

In *Re Title of Pa Pelekane*, 21 Haw. 175, 178, this court said: "At the close of the case for the Territory, the respondents, without resting, moved that the application be dismissed on the ground that the petitioner had failed to establish or support the material allegations of the petition, and had failed in its proof. The court granted the motion. The procedure was improper. A proceeding to bring land under the operation of the law providing for the registration of titles is of the nature of a suit in equity, and the rules of equitable procedure generally apply. In equity it is not correct practice for the court to dismiss a bill at the close of the complainant's case, on the motion of the respondent, unless the respondent also rests." The court cited in support of its conclusion *Territory v. McCandless*, 16 Haw. 728; *Texeira v. American Dry Goods Assn.*, 17 Haw. 41; *Estate of Keaho, Id.* 308.

In none of these cases was the court dealing with the precise question now under consideration. What it would have held if the respondent had rested at the close of complainant's evidence is merely conjectural. Since the respondent in the instant case chose not to offer any evidence but relied on the failure of the petitioner to establish his right to a favorable decree its motion to dismiss the petition was the equivalent of a final submission of the cause upon its merits. The complainant holding the affirmation of the issues thus presented should have been permitted to open and close the argument. In *Koebel v. Doyle*, 256 Ill. 610, 614, the court said: "The party has a right to submit his cause to the chancellor upon the evidence adduced if he sees fit, and the motion, if made, was neither more nor less than a submission of the cause to the chancellor."

We will next dispose of the contention of the receiver

relating to the form of the claims filed with it by Chalmers. This contention is that neither of these claims indicates on its face any intention by Chalmers to assert a right of preferential payment and therefore he cannot now assert such right. Assuming that neither of these claims bears upon its face any indication by Chalmers to have it classified as a preferential claim, we think this fact alone does not bar him from now claiming that it is of that character. It is conceded that there is nothing in the statute of 1925, to which we have already referred, which requires claimants to indicate in their written claims whether the trust company's indebtedness to them arose out of circumstances that give them a preference of payment or whether it arose out of circumstances that create an ordinary debt. It is also conceded that there is no such requirement in the order of the court under which the present receiver published notice to creditors to present their claims nor in the notice itself. It is easy to imagine a situation in which under the law of estoppel a creditor might so designate his claim as to mislead the receiver and thus preclude him from subsequently changing such designation. No such situation, however, exists in this case. The receiver has not been induced by the form of the claims filed by Chalmers to do anything detrimental to itself or to other creditors of the trust company. In the absence of facts which might create an estoppel and in the absence of legislative enactment we see no reason why Chalmers cannot now seek to establish his claim as one entitled to preferential payment. The receiver is an officer of the appointing court and it is its duty to classify and pay claims, not according to the form in which they are filed but according to the facts under which the indebtedness arose.

We come now to the consideration of the more important aspects of the case. The primary question, of course, is whether under the evidence Chalmers' claim was

at the time he filed it of that character which, according to the provisions of our statute relating to the use to be made of the assets of insolvent trust companies, places it in a position of advantage over other claims of a lesser degree. The statute (Sec. 3488, R. L. 1925,) is as follows:

"Upon the winding up, the assets of the company shall be used in the following manner, that is to say:

"1st. To the cost and expense of the winding up, including the receiver's compensation.

"2nd. To the payment of all obligations incurred by the corporation by reason of acting in a fiduciary capacity by appointment of any court.

"3rd. To the payment of all other fiduciary obligations of the corporation, including moneys received on trust account and obligations incurred while acting in a fiduciary capacity by appointment of individuals under wills, trust deeds, or otherwise.

"4th. To the payment of bonds, debentures, or other secured debts of the corporation.

"5th. To the payment of all other debts or obligations of the corporation.

"6th. To the distribution among the stockholders, pro rata, of any remaining assets."

It is contended by Chalmers that the obligation of the trust company to him arose out of circumstances that bring it within subsection three of the statute. His dealings with the trust company began on August 6, 1919, at which time he deposited the sum of $7000. Later he deposited other sums, the last deposit being on August 1, 1921. He testified that he believed that the trust company had opportunities and facilities for handling his money profitably that he did not have and that it agreed to invest and reinvest his funds according to its judgment and discretion in such securities as it might select bearing between seven and eight per cent interest and that it would remit to him the interest collected after deducting five per cent as compensation for its services. For reasons which we shall presently explain, even if we should

assume that this was the relation originally existing between the parties, we deem it unnecessary to decide whether it impressed upon the trust company's obligation to Chalmers the fiduciary character contemplated by subsection three of the statute.

The trust company made only three interest-bearing investments of Chalmers' money. $3,500 was invested in a promissory note of the Hawaii Garage, $4,000 in a note of Thomas Guard and $2,000 in a note of T. Kameoka, —a total of $9,500. The evidence is not clear as to when these investments were made but it is clear that they were made prior to July 22, 1920, for on that date the trust company credited Chalmers' account with the unpaid balance on all these notes together with the interest it had collected. The money that had been invested in these notes was thus restored to the fund which Chalmers claims the trust company held as his fiducial representative. After this the trust company never treated the money received from Chalmers otherwise than as its own property. It made no further investments of it for his benefit nor did it return any part of it to him nor did he demand its return. It kept it and either paid Chalmers the interest or credited him therewith and presumably used the principal for its own purposes. It is true that it did the quite unusual thing of debiting Chalmers with five per cent of this interest. The only effect of this, however, was to reduce the interest due him to that extent.

This method of dealing with the money received from Chalmers continued from July 22, 1920, to the time the receiver was appointed,—a period of about a year and a half.

This conduct of the trust company was entirely inconsistent with that of a trustee under a technical trust or even a mere agent dealing with funds received in a fiduciary capacity. Trustees and agents do not acknowledge themselves liable for nor pay interest on funds that re-

main in their hands uninvested, nor do they, if they are faithful stewards and intend to continue to act in their fiduciary capacity, use such moneys for their own individual purposes.

Assuming therefore, but, as we have already said, not deciding, that the relation between Chalmers and the trust company was prior to July 22, 1920, of such a character as to render the trust company's obligation to him a preferred claim under subsection three of the statute, it is clear that after that date the trust company, so far as lay within its power to do so, changed that relation into one of debtor and creditor merely. Of course such change could not be effected by the trust company so as to bind Chalmers without his knowledge and acquiescence. Let us, therefore, examine the evidence for the purpose of ascertaining whether Chalmers was informed after July 22, 1920, of what the trust company evidently considered to be its relation to him and whether he acquiesced in it.

On September 30, 1920, the trust company sent Chalmers a statement of his account for three months ending on that day. The statement of the account is as follows:

|  |  | Dr. | Cr. |
|---|---|---|---|
| | By balance as per June statement | | 3892.03 |
| July 2 | Hawaii Garage note #68 | | 125.00 |
| " | Interest on above to June 30, 1920 | | 55.35 |
| 2 | K. Kameoka #267 Int. to July 4, 1920 | | 35.00 |
| 22 | #152 T. Guard note | | 4000.00 |
| " | 267 K. Kameoka note | | 2000.00 |
| " | 68 Hawaii Garage | | 2875.00 |
| 31 | 5% commission on 215.35 | 10.77 | |
| Sept. 27 | Deposit | | 2629.13 |
| " | Payment a/c 100 shares Peoples Bank | 537.00 | |

| | | |
|---|---|---|
| 29 Interest to Sept. 30, 1920 | | 223.19 |
| " 5% commission on Interest | 11.16 | |
| 30 By Balance | 15275.77 | |
| | 15834.70 | 15834.70 |

Sept. 30 By Balance ................... $15275.77"

This statement, if he understood it, informed Chalmers that the balance due on the Hawaii Garage note, the Guard note and the Kameoka note, the only securities in which his money had been invested, was, so far as he was concerned, paid back to the trust company on July 22, 1920, and was held by it to his credit. It also informed him that since the payment of these notes the trust company had made no further investments in his behalf. It also informed him that the trust company had placed to his credit interest in the sum of $223.19 on all the money held by it to his credit since the payment of the above notes. It also informed him that it had debited him with five per cent of the interest to which he was thus entitled.

Subsequently Chalmers received from the trust company other statements of his account, which were sent him on the following dates: December 31, 1920; March 31, 1921; June 30, 1921; September 30, 1921, and December 31, 1921. All these statements, like the one of September 30, informed him, provided, of course, he was sufficiently intelligent to comprehend them, of two things that were of vital concern, namely, that the trust company had credited him with large balances, not a dollar of which was invested in his behalf, and that it was either paying him interest on these balances out of its own funds or acknowledging its liability to him for the interest. If Chalmers knew and understood the significance of these

facts he must have known that the trust company was not treating his money as a trust fund to be invested for his benefit, but as a part of its own assets to be used for its own purposes. If he appreciated this and acquiesced in it, either by failure to make objection or otherwise, he cannot now claim that the trust company's obligation to him is other than an ordinary debt.

In portions of his testimony Chalmers attempts to convey the impression that he was so ignorant of business methods and so unfamiliar with the usual forms in which accounts are rendered that he did not comprehend the meaning of the statements he received from the trust company and that notwithstanding these statements he believed the trust company had his money invested and that it was collecting the interest on the investments and crediting it to his account. On cross-examination, however, his testimony was materially different. In answer to questions propounded by opposing counsel he stated in substance that at the time the trust company invested his funds in the Hawaii Garage note, the Guard note and the Kameoka note he was so informed and that he was also informed when these notes were paid and that he knew after their payment that the trust company was carrying a cash balance in his favor of $15,275.77, upon which it had credited him with eight per cent interest less five per cent commission on the interest.

The following questions and answers disclose his understanding of the information contained in the statements concerning the allowance of interest and also as to whether the balances carried by the trust company to his credit were invested for his benefit: "Q You understood that they were allowing you 8 per cent interest on the cash in their hands less 5 per cent on that interest? You understood that? A Yes. Q That was in accordance with your understanding of what the agreement was? A Yes. Q In accordance with your understanding that

you were to get 8 per cent interest on your money less 5 per cent commission? A Yes. Q Whether the money was invested or whether it was not invested; that it was their own lookout to have it invested? A Yes. Q But you knew during all these months that the money was not invested? A I did not. Q You knew from the statements of account? A I was only going by the statements; I did not know. Q From the statements during all these months you were informed that your money was not invested? A Just according to the statements."

His answers to the questions, if they have any significance at all, indicate that he knew from the statements that his money was not being invested for his benefit and that the trust company was allowing him interest on it. If he had even a rudimentary knowledge of financial affairs he must have known that the trust company would not pay or agree to pay interest on money it was not using. Interest is paid for the *use* of another's money and not for the mere pleasure of possessing it. When, therefore, he ascertained that the trust company was either paying him interest or acknowledging its liability for interest on uninvested balances credited to him he should be held to have known that the trust company was treating the money represented by these balances, not as a trust fund but as its own property. If he objected to this he should have so informed the trust company. This he did not do. His failure to do this was the equivalent of consent. Having consented the relation between him and the trust company became that of debtor and creditor no matter what it may have been originally.

*In re Broad,* 13 L. R. (Q. B.) 740, 746, Cotton, L. J., said: "If a man pays interest for money he must be entitled to the use of it. When a man locks up money which is intrusted to him in a box, he does not pay interest on it. I think we must judge of the contract between the parties from the course of dealing and from the accounts

which were rendered, and, looking at the whole course of dealing, in my opinion, although, so long as the remittance remained in specie, the customer might have said, 'Hand it over to me,' yet, looking at the accounts rendered from time to time, the inference is, that the banker was to be at liberty to put himself in funds by cashing the remittances, and, when he had done so, to treat himself, not as a trustee of the proceeds for the customer, but only as a debtor to the customer for the sum which he had thus received. In my opinion, interest being from time to time carried to the credit of the customer in the account, the banker was entitled to put the proceeds into his own pocket, not keeping them separate from his general account."

The decree appealed from is affirmed.

*C. S. Carlsmith* (also on the briefs) for claimant.

*H. Irwin, W. H. Smith* and *A. L. Castle* (*H. Irwin* and *W. H. Smith* on the briefs) for the receiver.